# Exhibit A



# CSC

## Notice of Service of Process

null / ALL
**Transmittal Number: 21606055**
**Date Processed: 06/11/2020**

| | |
|---|---|
| **Primary Contact:** | Peter Antonenko<br>Jetcraft Corporation<br>920 2nd Ave South<br>Ste 935<br>Minneapolis, MN 55402 |

| | |
|---|---|
| **Entity:** | Jetcraft Corporation<br>Entity ID Number 3256227 |
| **Entity Served:** | Jetcraft Corporation |
| **Title of Action:** | Heidi Aviation, LLC vs. Jetcraft Corporation |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Superior Court, DC |
| **Case/Reference No:** | 2020 CA 002640 B |
| **Jurisdiction Served:** | North Carolina |
| **Date Served on CSC:** | 06/09/2020 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | W. Hunter Winstead<br>202-772-2344 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674  (888) 690-2882  |  sop@cscglobal.com

**Filed**
**D.C. Superior Court**
**05/29/2020 10:28PM**
**Clerk of the Court**

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

HEIDI AVIATION, LLC,
2507 Massachusetts Avenue, NW
Washington, DC 20008,
      Plaintiff,

    v.

JETCRAFT CORPORATION,
1750 East International Drive, Suite 202
Morrisville, NC 27560,

and

WINGS INSURANCE AGENCY, INC.,
14871 Pioneer Trail
Eden Prairie, MN 55347,
      Defendants.

Civil Action No.:   2020 CA 002640 B

## COMPLAINT

Plaintiff Heidi Aviation, LLC ("Heidi), by and through undersigned counsel, for its

Complaint against Defendants Jetcraft Corporation ("Jetcraft") and Wings Insurance Agency,

Inc. doing business as Wings Insurance ("Wings") (collectively, the "Defendants"), respectfully

show and allege as follows.

## NATURE OF THE ACTION

1.    This civil action arises from the Defendants' misrepresentations and failures to

fulfill their contractual obligations, fiduciary duties, and duties of care owed to Heidi in advising

Heidi and placing insurance coverage for a 2001 Dornier 328 Jet N330BG aircraft (the "Dornier"

or the "Aircraft") owned by Heidi and insured by XL Specialty Insurance Company ("XL"). As discussed further below, Jetcraft (an aviation broker) and Wings (an aviation insurance specialist) were responsible for obtaining the insurance coverage Heidi required for the Dornier.

2.      As a direct result of Jetcraft's and Wings' faulty advice, misrepresentations, negligence, errors, omissions, and failures to satisfy their duties and contractual obligations owed to Heidi described below, when Heidi's Dornier aircraft sustained physical damage that should have been covered by XL's insurance policy, XL denied coverage, rescinded its policy, and commenced litigation against Heidi based on its contentions that Heidi's insurance applications, prepared and submitted by Jetcraft and Wings, contained material misrepresentations. Heidi was denied over $2.4 million in insurance benefits that it should have received from XL under the rescinded policy. In addition, Heidi incurred hundreds of thousands of dollars of legal fees and costs in defending the rescission litigation commenced by XL in this Court as a result of Jetcraft's and Wings' wrongful conduct described herein.

3.      Heidi therefore brings this action for relief, seeking monetary damages, attorneys' fees and costs, prejudgment interest, and such other and further relief as the Court may deem just and proper.

## THE PARTIES

4.      Heidi Aviation, LLC is a Delaware corporation that functioned as a holding company for the Dornier and other planes. Heidi is a subsidiary of Bancroft, a project management and development company which functions, in part, as a not-for-profit non-government organization that works to provide stability in conflict areas throughout the world. Bancroft is comprised principally of two Delaware limited liability corporations (Bancroft

2

Global Development, LLC and Bancroft Global Investments, LLC) and maintains its headquarters in Washington, D.C.

5.      Upon information and belief, Jetcraft is a corporation organized under North Carolina law with its headquarters in Raleigh, North Carolina. Jetcraft describes itself as a "global leader in aircraft sales, acquisitions, and trades." Jetcraft is a broker that assists clients in, among other things, negotiating the purchase and facilitating the acquisition of private aircraft. In doing so, Jetcraft advises and assists its clients in procuring insurance coverage for aircraft.

6.      Upon information and belief, Wings is a corporation organized under Minnesota law with its principal place of business in Eden Prairie, Minnesota. Wings is an insurance broker that specializes in placing aviation insurance coverage. Wings holds itself out as "the most knowledgeable, results oriented, and genuine aviation insurance professionals in the business."

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this claim pursuant to D.C. Code. § 11-921. The amount in controversy exceeds $3 million, exclusive of interest and costs.

8.      This Court has personal jurisdiction over Jetcraft and Wings pursuant to D.C. Code. § 13-423, sections (1), (2), (3) and/or (4). Jetcraft and Wings transacted business in the District of Columbia, including through entering into contracts with Heidi whereby they provided services to Heidi in the District of Columbia. Both Jetcraft and Wings have caused tortious injury to Heidi by acts and/or omissions committed in the District of Columbia. To the extent Heidi's tortious injuries arise from acts and/or omissions of Jetcraft and/or Heidi committed outside of the District of Columbia, upon information and belief, both Jetcraft and Wings regularly conduct or solicit business, engage in a persistent course of conduct, and/or

3

derive substantial revenue from services rendered, in the District of Columbia. Jetcraft and Wings have otherwise purposefully availed themselves of jurisdiction in the District of Columbia, have ample contacts with the District of Columbia (both through their work with Heidi described herein and otherwise) and the exercise of personal jurisdiction over both Defendants in the District of Columbia comports with the Due Process requirements of the United States Constitution.

9.     Venue is proper in this Court because Heidi is headquartered in the District of Columbia, Wings and Jetcraft are subject to the Court's personal jurisdiction, and because a substantial part of the events or omissions giving rise to this action occurred within this jurisdiction. Specifically, both Jetcraft and Wings were engaged by Heidi to provide services in the District of Columbia and participated in the procurement of insurance policies that were issued in the District of Columbia to Heidi, which maintains its offices in the District of Columbia.

## FACTUAL BACKGROUND

### *Jetcraft Brokers Heidi's Purchase of the Dornier*

10.     On August 3, 2015, Heidi executed an Aircraft Acquisition Agreement with Jetcraft, whereby, in exchange for payment, Jetcraft agreed to provide "aircraft selection and acquisition services" to Heidi for a "Mid Size Turbine Corporate Aircraft." Jetcraft's obligations to Heidi under this agreement included, but were not limited to, "negotiations with third parties on behalf of and with the direction of [Heidi], coordinating and supervising demonstration flights, conducting or facilitating pre-purchase due diligence, and assisting [Heidi] in completing and filing documentation necessary [to] implement a lease or purchase of an identified aircraft."

4

The Aircraft Acquisition Agreement required Jetcraft to use its "best efforts" and to "act in a manner that is consistent with [Heidi's] best interests."

11.     Heidi's contact at Jetcraft, Mr. Dan Dunn, previously worked with Heidi's principals to acquire other aircraft owned by Heidi and a Heidi affiliate, which were operated predominantly in Africa. The business of Heidi's parent company, Bancroft, is international in scope with projects in process throughout the world, including in Africa. Both Jetcraft and Wings knew and understood the international scope of Heidi's business and the anticipated operation abroad of any aircraft Heidi would purchase.

12.     Mr. Dunn and Jetcraft also assisted Heidi and its affiliate in obtaining insurance coverage for their prior aircraft in coordination with Wings.

13.     In connection with Heidi's efforts to purchase the Aircraft, Mr. Dunn and Jetcraft again worked with Wings to obtain insurance. The insurance requirements for any aircraft Heidi would purchase were unique, given the nature and location of the operations of Heidi and its parent and affiliated companies. Bancroft manages complex projects across the world, including in Afghanistan, Kenya, Libya, Somalia, Uganda, and the United Arab Emirates, and utilizes aircraft owned and operated by Heidi to support its operations. The scope and nature of Heidi's and Bancroft's operations were well-known and understood by both Jetcraft and Wings as a result of their prior work with Heidi in procuring insurance for aircraft flown in Africa and other areas of operation for Heidi/Bancroft.

14.     By early 2016, Heidi and Jetcraft had identified the Dornier as a target for acquisition and begun to take steps to effectuate its purchase.

5

15.     Jetcraft owned the Dornier and was the seller in the transaction whereby Heidi acquired the Aircraft. At the same time Heidi purchased the Dornier from Jetcraft, Heidi sold Jetcraft a different plane previously operated by Heidi in Africa.

16.     Heidi would not finalize a transaction to acquire the Dornier without having insurance in place to protect the Aircraft once it took possession. Given the financial benefits to Jetcraft in facilitating the acquisition of the Dornier and concurrent sale of Heidi's former plane to Jetcraft, Jetcraft had a pecuniary incentive to place coverage for the Dornier so that Heidi would finalize the deal.

17.     On January 25, 2016, Heidi entered into an Aircraft Purchase Agreement, whereby it agreed to acquire the Dornier from Jetcraft. The transaction whereby Heidi acquired the Dornier, pursuant to the terms in the Aircraft Purchase Agreement, closed on March 8, 2016.

*Wings is Engaged as Heidi's Insurance Broker*

18.     In furtherance of its efforts to sell the Dornier to Heidi, Jetcraft requested, on behalf of Heidi, that Wings serve as Heidi's aviation insurance broker and procure insurance coverage for the Dornier.

19.     Specifically, on or about February 1, 2016, Mr. Dunn contacted Mr. Tom Hauge, a relationship manager at Wings, and requested, on behalf of Heidi, that Wings procure insurance coverage for the Dornier that would provide coverage for possible claims or losses that might arise from the operation of the Aircraft abroad in support of the international business of Heidi and its parent and affiliated companies.

20.     Wings and their employees (specifically Mr. Hauge) orally agreed that day to act and did act as Heidi's insurance broker for the purpose of procuring the requested aviation insurance coverage for the Aircraft (the "Wings Engagement Agreement"). Wings and Heidi

6

manifested an intent to be bound to this contractual arrangement through their subsequent performance, whereby Wings did in fact hold itself out and act as Heidi's insurance broker in connection with procuring insurance coverage for the Dornier.

21.     Given its compensation arrangement, whereby Wings would be paid a commission upon the successful placement of insurance coverage for the Dornier, Wings had a pecuniary incentive to secure the insurance requested for the Aircraft.

22.     As part of its brokering of the insurance for the Dornier, Jetcraft and/or Wings, among other things, prepared and submitted to prospective insurers Heidi's submissions (including applications) relating to the placement and renewal of insurance for the Dornier, presented the proposed terms of coverage to Heidi, advised Heidi on the scope and terms of coverage, advised Heidi regarding its submissions to insurers, provided notice of claims to XL on behalf of Heidi, served as an intermediary between Heidi and XL, and administered the renewal of Heidi's insurance for the Dornier.

23.     Jetcraft and Wings directly transacted business with Heidi in the District of Columbia in connection with many of these activities. Jetcraft and Wings also routinely engaged in phone calls and electronic mail communications with Heidi personnel located in the District of Columbia pertaining to insurance for the Dornier.

24.     Throughout their multi-year business relationship, Heidi relied on Jetcraft and Wings to advise and guide Heidi on the scope and terms of its insurance and with respect to the submission of documents, including applications, to insurers.

25.     Jetcraft and Wings both understood that the Heidi principals with whom they interacted did not have insurance expertise, and that Heidi relied on Jetcraft and Wings for guidance with respect to insurance coverage placements, applications, and renewals.

7

26.     It was standard practice for Jetcraft and/or Wings to handle direct communications with Heidi's insurers, and for Heidi not to speak directly with or receive direct communications from its insurers. Instead, as a general matter, Jetcraft and/or Wings would exercise their judgment about what information to relay to Heidi, and Heidi relied on Jetcraft and Wings to inform it of what it needed to know with respect to its insurance program, including its submission of applications and other materials to prospective insurers.

27.     In procuring the requested aviation insurance coverage for the Aircraft, Jetcraft and Wings had a duty and an obligation to exercise good faith and reasonable skill, care, and diligence, including with respect to the preparation of Heidi's requests for quotes and insurance applications, described further below.

*Jetcraft and Wings Make Misrepresentations to XL and Heidi in Procuring Insurance for the Dornier*

28.     Using information provided by Jetcraft, Jetcraft and Wings generated an "Aircraft Request for Quote" (the "RFQ") circular to distribute to prospective insurers and to solicit quotes for insurance coverage for the Dornier on behalf of Heidi prior to Heidi's acquisition of the Aircraft. Heidi did not participate in the preparation of the RFQ.

29.     The RFQ sought $2.4 million in "Aircraft Hull" coverage and $200 million in "Aircraft Liability" coverage. On February 4, 2016, Wings distributed the Heidi RFQ to over a dozen aviation insurers, including XL. Upon information and belief, in response to the RFQ, Wings received inquiries from multiple prospective insurers regarding the anticipated location of the Dornier's operations, but did not specifically disclose to inquiring underwriters that the Aircraft would be flown and predominantly operated in Africa.

30.     The RFQ included the following statements regarding Heidi's prospective ownership of the Dornier: "**Use**: Industrial Aid **Storage**: Hangared at **Base Airport**: IAD."

8

31.     Jetcraft and Wings determined what to disclose as the Aircraft's "Use," "Storage," and "Base Airport" in the RFQ.

32.     In preparing the RFQ representations (which Jetcraft and Wings later adopted and incorporated into the Initial Application and Wings then adopted and incorporated into the Renewal Application described below) Jetcraft and/or Wings concluded, in consultation with each other (but not Heidi), that notwithstanding the anticipated nearly exclusive operation of the Dornier in Africa and other locations abroad, it was permissible and accurate to designate IAD - Dulles as the "Base Airport" in disclosures to Heidi's prospective insurers. This was incorrect and the inclusion of this misrepresentation in the RFQ and Heidi's subsequent insurance applications to XL was the basis for XL's denial of coverage and rescission of the Renewal Policy. XL also contended that the "Use" designated by Jetcraft and Wings in the RFQ and Heidi's subsequent insurance applications, was misrepresented.

33.     In response to the RFQ and in reliance upon the information contained therein, XL provided a quote to insure the Aircraft.

34.     Heidi accepted XL's quote on March 8, 2016 and purchased from XL an "Aviation Hull & Liability Policy" numbered UA00012296AV16A for the Policy Period of March 9, 2016 to March 9, 2017 (the "Initial Policy").

35.     After coverage for the Initial Policy was agreed and bound by the parties, Wings requested that Heidi sign an insurance application form. The form was created by Wings and was provided to Heidi with pre-populated answers written by Jetcraft and Wings. These pre-populated answers included the representations regarding the Aircraft's "Use" as "Corp./Industrial Aid" and "Base Airport" as "IAD." This information was taken from the RFQ

9

that Jetcraft and Wings had prepared. Heidi did not draft the information and disclosures included in the application; Jetcraft and Wings did so.

36.     Jetcraft and Wings knew that Heidi lacked insurance expertise and that the company and its principals relied on Jetcraft's and Wings' advice and guidance in insurance matters, generally, including the meaning of various terms of art in an insurance application and how to respond to questions therein (questions that Wings had drafted and answers that Jetcraft and Wings had drafted). Jetcraft and Wings understood and accepted this heightened responsibility.

37.     Based upon and in reasonable reliance upon the guidance provided by the aviation specialists at Jetcraft and Wings, on March 10, 2016, Heidi signed the Wings Insurance Application Form, without modifying the information populated therein by Jetcraft and Wings (the "Application"). Jetcraft and Wings never informed Heidi that it would be incorrect and a misrepresentation that could jeopardize coverage to identify Dulles as the "Base Airport" or "Corp./Industrial Aid" as the "Use" in the Application, as they had drafted it. The Application was submitted to XL on March 11, 2016, and included the following statements which tracked the information Jetcraft and Wings had drafted for the RFQ: "**Use:** Corporate/Ind. Aid (Professionally Flown) **Storage:** Hangared at **Base Airport:** IAD."

38.     The Initial Policy provided $2.4 million in "Aircraft Hull" coverage and $200 million per occurrence in "Aircraft Liability" coverage.

39.     At the conclusion of the Initial Policy, Heidi sought to renew insurance coverage for the Aircraft with XL.

40.     On December 10, 2016, Wings requested that Heidi complete a two-page Wings Renewal Application for Insurance (the "Renewal Application"), for the policy period of

March 9, 2017 to March 9, 2018.  The Renewal Application was populated by Wings and adopted and incorporated the same representations regarding the Aircraft's "Use" and "Base Airport" that Jetcraft and Wings had included in the RFQ and the first Application (without revision from Heidi).  Wings never informed Heidi that it would be incorrect and a misrepresentation that could jeopardize coverage to identify Dulles as the "Base Airport" or "Corp./Ind. Aid" as the "Use" in the Renewal Application, as it had been drafted.

41.      On December 13, 2016, Heidi signed the Renewal Application, without modifying the information contained therein that had been provided by Jetcraft and Wings.

42.      On December 23, 2016, Wings submitted Heidi's Renewal Application to XL.

43.      On February 16, 2017, Wings requested that XL bind coverage for an additional year for the Dornier consistent with the same limits of liability and other material terms provided by the Initial Policy.

44.      XL issued Aviation Hull and Liability Insurance Policy No. UA00012296AV17A to Heidi effective March 9, 2017 to March 9, 2018 (the "Renewal Policy").

45.      As requested, the Renewal Policy provided $2.4 million in "Aircraft Hull" coverage and $200 million per occurrence in "Aircraft Liability" coverage.

46.      In preparing the RFQ, the Application, and the Renewal Application, Jetcraft and Wings failed to properly consider or advise Heidi on the meaning of the terms "Base Airport" or "Use" or the potential detrimental effect or limitations that representing Dulles as the "Base Airport" or "Corp./Industrial Aid" as the "Use" would have on Heidi's insurance coverage for the Dornier.  These statements in the Application and the Renewal Application were represented to Heidi as accurate and appropriate by Jetcraft and Wings.  They were not.

11

47.    Jetcraft and Wings knew or should have known that the Dornier was anticipated to operate almost exclusively in Africa during the policy periods of the Initial Policy and the Renewal Policy. Jetcraft and Wings knew that Heidi's prior aircraft had been operated predominantly in Africa with one of its prior aircraft designating its "base" in Africa. Jetcraft and Wings knew or should have known the meaning of the term "Base Airport" given their specialized aviation expertise and that representing Dulles as the Dornier's "Base Airport" was a misrepresentation that would jeopardize Heidi's insurance with XL. Jetcraft and Wings were also aware that Heidi would potentially use the Dornier in flights that XL might later (and did later) argue required different disclosures regarding the Aircraft's "Use."

*XL's Insurance Policy Provided Coverage for Physical Damage to the Dornier and Other Losses that Heidi Would Later Sustain From a "Belly Landing" of the Dornier*

48.    Both the Initial Policy and the Renewal Policy included a section captioned "Physical Damage Coverages," which states the following:

In the event of a total loss, the company will promptly pay the named insured:

a. the insured value of the scheduled aircraft;

b. the name insured's financial interest in any spare engine or spare part (less any applicable deductible) but not exceeding its actual cash value or the Limits for the applicable coverage in the Declarations, whichever is less.

In addition, the company will promptly refund the pro-rated unearned premium for any scheduled aircraft that is a total loss. At the time of payment of a total loss by the company, the company's liability, with respect to such property, will end.

49.    "Total Loss" is defined in the Initial Policy and the Renewal Policy as "any physical loss for which the cost to repair when added to the salvage value equals or exceeds: 1. the insured value of a scheduled aircraft, or 2. the actual cash value of any other covered property."

12

50.     In addition to the Renewal Policy's coverage for "property damage" to the Aircraft, Part 4 of the Policy provides "Additional Coverages" that include, among other things, coverage for replacement rental aircraft, reimbursement of passengers' trip interruption expenses, returns of premiums, and other expenses incurred by the policyholder as a result of the loss of use of an insured aircraft.

51.     Heidi paid all premiums for the Renewal Policy in full and all other applicable conditions and prerequisites to coverage under the Renewal Policy were satisfied (as was also the case with the Initial Policy).

*The Dornier Sustains Damage and Heidi Submits an Insurance Claim to XL*

52.     On May 30, 2017, the Dornier experienced a landing gear malfunction, and the aircraft was damaged in a belly landing at Aden Adde International Airport in Mogadishu, Somalia (the "Belly Landing"). The damage to the Aircraft arising from the Belly Landing is undisputedly the sort of loss that should have triggered the Renewal Policy and provided a substantial payment to Heidi pursuant to the Physical Damage Coverages section and other provisions in the Renewal Policy.

53.     Later that same day, Heidi, through Wings, timely notified XL regarding its claim for insurance coverage under the Renewal Policy for damage sustained to the Aircraft due to the Belly Landing. In the Incident and Damage Summary submitted to XL, the Belly Landing was described as follows:

> Normal approach and lending sequence.  After gear was extended crew noticed only 2 green lights on nose gear and Right Main Gear.  The crew executed a low approach with the tower.  Tower confirmed Left Main gear not extended.  Both nose and Right Main extended.  Crew did a missed approach and raised the gear. Followed checklist procedures for alternate landing gear extension.  Still no green light in left main gear.  Both nose gear and Right Main had green lights.  The crew executed another low approach with the tower.  Both tower and aircraft on the ground confirmed Left Main gear not extended.  Nose and Right Main

13

extended.   Attempted checklist procedure for alternate gear extension again.
Same result with only 2 green lights.  Checklist says to land gear up in case of one
Main gear and one nose gear extended.  Few the approach to a touchdown on the
runway.  All 4-crew egressed out the Right hatch just behind the cockpit after
following egress procedures.  Crew members exited the aircraft unharmed.  No
injuries to anyone on the ground and no significant damage to the airfield.

54.     Wings immediately provided XL with a detailed report regarding the Belly

Landing, including extensive information regarding the state of the Aircraft, and photographs of

the damage to the Aircraft.

55.     On June 13, 2017, Heidi advised XL that it had "taken the necessary steps to

secure the Aircraft to preserve its value," but was awaiting instructions from XL regarding the

salvage and recovery process.

56.     On June 15, 2017, XL confirmed that Heidi was authorized to decommission and

salvage the Aircraft, with XL and Heidi agreeing that Heidi:  "(1) will undertake removal of

components including storage and sale of components that it reasonably deems to be of value,

including sale at prices and on terms that it reasonably deems fair under the circumstances,

(2) will keep records of components removed, stored and sold, as well as records of proceeds

received from the sale, and (3) will dispose of the unsalvaged airframe."[1]

57.     The Aircraft was treated by Heidi and XL as a "Total Loss" under the Renewal

Policy.  The "Total Loss" of the Dornier should have resulted in, at a minimum, a $2.4 million

payment under the Renewal Policy by XL.  XL has never contested that the "physical damage"

of the Dornier was covered by the Renewal Policy and all pertinent conditions of coverage had

---

[1] The salvageable parts of the Aircraft have been returned to the United States and stored, at
Heidi's expense.  A small number of the Aircraft's salvaged parts have been sold.
Heidi does not seek damages from Jetcraft or Wings for net proceeds realized from the sale of
salvaged parts (after accounting for Heidi's expenditures to remove, store and sell) it has
recouped as a result of these efforts to mitigate its damages.

been satisfied. None of the Renewal Policy's various coverage conditions and/or exclusions precluded coverage for Heidi's loss.

*XL Denies Coverage, Rescinds its Policy, and Sues Heidi Based on the Misrepresentations Made by Jetcraft and Wings*

58. On June 22, 2017, XL acknowledged that "the information provided confirms that the Aircraft sustained physical damage . . . as defined by the Policy . . . ." But XL reserved its rights regarding "a question as to whether the Aircraft was being operated as represented to the underwriter during the procurement of the Policy" and requested additional information regarding the location and use of the Aircraft during the past fourteen months. Heidi promptly provided the information requested by XL.

59. On September 8, 2017, XL advised Heidi that it was rescinding the Renewal Policy and there was no coverage for the damage to the Aircraft that resulted from the Belly Landing. XL's rescission of the Renewal Policy was based solely upon its contention that the Aircraft had not been operated as represented to XL during the procurement and underwriting of the Renewal Policy. Specifically, XL contended that the statements contained in the RFQ, the Application, the Renewal Application, and the RFQ regarding the Aircraft's "Base Airport" and "Use" (with its primary focus on the Aircraft's "Base Airport"), were false, and materially impacted XL's decision to issue the Initial Policy, the Renewal Policy, and the terms offered.

60. All of these statements in the RFQ, the Application, and the Renewal Application were authored and disseminated by Jetcraft and Wings, who represented to Heidi that the responses they drafted in the Application and the Renewal Application were accurate and appropriate to submit to prospective insurers, including XL. Heidi reasonably relied upon Jetcraft's and Wings' representations and advice, as well as their professional experience and expertise in preparing the RFQ, the Application, and the Renewal Application.

15

61.     XL filed its rescission action against Heidi in this Court on September 11, 2017.

62.     Heidi filed a counterclaim against XL seeking coverage under the Renewal Policy and defended XL's rescission litigation, at significant expense, for over eighteen months. The rescission litigation with XL was resolved confidentially in 2019, following a pre-trial conference.

63.     As a direct result of Jetcraft's and Wings' breaches of their contractual obligations and fiduciary duties, wrongful and negligent conduct, misrepresentations, and misstatements in procuring Heidi's insurance for the Dornier, Heidi suffered substantial damages insofar as it did not receive the insurance proceeds it should have been paid under the terms of the Renewal Policy for its losses arising from the Belly Landing. In addition, Heidi had to incur hundreds of thousands of dollars in attorneys' fees and costs to defend XL's rescission action, which was based upon the misrepresentations in the Renewal Application authored and advised by Jetcraft and Wings.

64.     As an experienced aircraft broker and aviation insurance broker, Jetcraft and Wings, respectively, should have understood the meanings of and appropriate responses to the "Base Airport" and "Use" queries in the Application and Renewal Application and the profound consequences on the coverage available from XL if the disclosures in these documents were inaccurate.

65.     Yet, despite their stated expertise as aviation specialists and knowledge that submissions to XL would have significant consequences on Heidi's insurance coverage, Jetcraft and Wings failed to correctly advise and provide adequate service to Heidi in connection with the preparation of Heidi's submissions to XL.

16

66.     Specifically, despite their knowledge that the RFQ, the Application, and the Renewal Application could materially and detrimentally impact the insurance that Heidi sought, Jetcraft and Wings failed to ensure that the submissions to XL were accurate and to accurately advise Heidi regarding the terminology used in the submissions to XL and the representations in those submissions drafted by Jetcraft and Wings.

67.     Jetcraft's and Wings' failures, individually and collectively, constitute wanton, willful, and/or grossly negligent misconduct.

68.     As a direct and proximate result of Jetcraft's and Wings faulty advice, errors, misrepresentations, misstatements, and omissions in preparing submissions to XL on Heidi's behalf, and breaches of their professional, contractual, and fiduciary obligations to Heidi, Heidi's insurance under the Renewal Policy was rescinded and its claim against XL arising from the "Belly Landing" was denied and then litigated by XL. This conduct by the Defendants cost Heidi millions of dollars in insurance coverage that would have otherwise been provided under the Renewal Policy and several hundred thousand dollars in attorneys' fees and costs in defending XL's rescission litigation, as well as other monetary damages.

## COUNT I
### (Breach of Contract Against Jetcraft)

69.     Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

70.     Jetcraft entered into the above-described Acquisition Services Agreement with Heidi which is valid, enforceable, and required Jetcraft to provide services thereunder that included advising Heidi and assisting Heidi in attempting to procure insurance for the Dornier. Heidi fully complied with all of its obligations with respect to its contract with Jetcraft.

17

71.     Pursuant to its contractual relationship with Heidi described above, Jetcraft undertook, among other things, an ongoing duty to advise and assist Heidi in procuring insurance coverage for the Dornier.

72.     Among other acts as discovery may reveal, Jetcraft breached its contractual obligations to Heidi by failing to competently advise and assist Heidi in obtaining insurance coverage for the Dornier and by drafting and submitting documents on Heidi's behalf to XL that contained material misrepresentations, errors, and omissions.  Specifically, Jetcraft breached its contractual obligations to Heidi by:

> (a)     failing to advise Heidi regarding the meaning of the terms "Base Airport" and "Use" in the Application;
>
> (b)     failing to advise Heidi regarding how to correctly respond to the questions in the Application regarding "Base Airport" and "Use;"
>
> (c)     furnishing the information regarding the Dornier's "Base Airport" and "Use" that was included in the RFQ, the Application, and the Renewal Application and which included misrepresentations;
>
> (d)     presenting, in coordination with Wings, the pre-populated Application form with misrepresentations regarding the Dornier's "Base Airport" and "Use" to Heidi for signature and misrepresenting to Heidi that the information contained therein was appropriate to submit to XL;
>
> (e)     failing to correctly analyze the Dornier's "Base Airport" and "Use" and inquire to Heidi as to whether its RFQ and Application should be amended or supplemented to modify the pre-populated disclosures drafted by Wings and Jetcraft;
>
> (f)     working with Wings to incorporate into the RFQ and the Application inaccurate information, including information ascertained through Wings' brokerage of insurance for a separate aircraft for Heidi's principals;
>
> (g)     failing to confer with Heidi regarding the inaccurate information and/or misrepresentations in its RFQ and Application and presenting the Application with misrepresentations to Heidi for signature;
>
> (h)     failing to ensure that the information set forth in the RFQ and the Application was accurate; and

        (i)     failing to advise Heidi not to submit the RFQ and the Application to insurers with the misrepresentations contained therein.

73.    As a direct and proximate result of the aforesaid actions, misstatements, errors, and omissions by Jetcraft, Heidi has sustained actual damages in an amount to be proven at trial.

## COUNT II
### (Breach of Contract Against Wings)

74.    Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

75.    Wings entered into the Wings Engagement Agreement with Heidi, which is valid, enforceable, and required Wings to provide services thereunder that included advising Heidi and assisting Heidi in attempting to procure insurance for the Dornier. Heidi fully complied with all of its obligations with respect to the Wings Engagement Agreement.

76.    Pursuant to its contractual relationship with Heidi described above, Wings undertook an ongoing duty to advise and assist Heidi in procuring insurance coverage for the Dornier.

77.    Among other acts as discovery may reveal, Wings breached its contractual obligations to Heidi by failing to competently advise and assist Heidi in obtaining insurance coverage for the Dornier and by drafting and submitting documents on Heidi's behalf to XL that contained material misrepresentations, errors, and omissions. Specifically, Wings breached its contractual obligations to Heidi by:

        (a)    failing to advise Heidi regarding the meaning of the terms "Base Airport" and "Use" in the Application and Renewal Application forms;

        (b)    failing to advise Heidi regarding how to correctly respond to the questions in the Application and Renewal Application forms regarding "Base Airport" and "Use;"

19

(c)    furnishing the information regarding the Dornier's "Base Airport" and "Use" that was included in the RFQ, the Application, and the Renewal Application and which included misrepresentations;

(d)    presenting, in coordination with Jetcraft, the pre-populated Application form (and later the Renewal Application) with misrepresentations regarding the Dornier's "Base Airport" and "Use" to Heidi for signature and misrepresenting to Heidi that the information contained in those forms was appropriate to submit to XL;

(e)    failing to correctly analyze the Dornier's "Base Airport" and "Use" and inquire to Heidi as to whether its RFQ, Application, and Renewal Application should be amended or supplemented to modify the pre-populated disclosures drafted by Wings;

(f)    incorporating into the RFQ, the Application, and the Renewal Application inaccurate information, including information ascertained through Wings' brokerage of insurance for a separate aircraft for Heidi's principals;

(g)    failing to confer with Heidi regarding the inaccurate information and/or misrepresentations in its RFQ, the Application, and the Renewal Application and presenting the Application and Renewal Application with misrepresentations to Heidi for signature;

(h)    failing to ensure that the information set forth in the RFQ, the Application, and the Renewal Application was accurate; and

(i)    failing to advise Heidi not to submit the RFQ, the Application, and the Renewal Application to insurers with the misrepresentations contained therein.

78.    As a direct and proximate result of the aforesaid actions, misstatements, errors, and omissions by Wings, Heidi has sustained actual damages in an amount to be proven at trial.

### COUNT III
### (Negligence Against Jetcraft)

79.    Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

80.    Jetcraft holds itself out to the public as an expert in and a "global leader" in aviation sales, acquisition, and trades.

81.     Under the Acquisition Services Agreement, Heidi engaged Jetcraft to procure the Dornier. In furtherance of these efforts, and as Jetcraft had in prior engagements for Heidi, Jetcraft undertook to procure insurance coverage for Heidi's Aircraft. Heidi specifically requested that Jetcraft procure insurance for the Dornier that would provide coverage for any possible claims or losses related to its operations abroad, including in Africa.

82.     Jetcraft accepted Heidi's request and agreed to and did in fact work with Wings for the purpose of procuring insurance coverage for the Dornier.

83.     By agreeing to do so, Jetcraft undertook a duty to Heidi to act in good faith and exercise reasonable skill, care, and diligence in advising Heidi about and procuring the requested insurance coverage. In this capacity, Jetcraft had an obligation and a duty to advise Heidi with respect to its submissions to prospective insurers, including XL, and to facilitate the placement of valid insurance coverage for the Dornier. Jetcraft was obligated to exercise reasonable care in completing these undertakings.

84.     During the course of Heidi's relationship with Jetcraft, Heidi had a right to rely upon Jetcraft's expert knowledge regarding aviation and insurance coverage.

85.     Jetcraft failed to exercise reasonable care in preparing Heidi's submissions to prospective insurers, including XL; in advising Heidi regarding those submissions; and in facilitating the placement of valid insurance for the Dornier. Among other acts as discovery may reveal, Jetcraft breached its duty to exercise reasonable care by:

> (a)     failing to advise Heidi regarding the meaning of the terms "Base Airport" and "Use" in the Application;
>
> (b)     failing to advise Heidi regarding how to correctly respond to the questions in the Application regarding "Base Airport" and "Use;"
>
> (c)     furnishing the information regarding the Dornier's "Base Airport" and "Use" that was included in the RFQ, the Application, and the Renewal Application and which included misrepresentations;

21

(d) presenting, in coordination with Wings, the pre-populated Application form with misrepresentations regarding the Dornier's "Base Airport" and "Use" to Heidi for signature and misrepresenting to Heidi that the information contained therein was appropriate to submit to XL;

(e) failing to correctly analyze the Dornier's "Base Airport" and "Use" and inquire to Heidi as to whether its RFQ and Application should be amended or supplemented to modify the pre-populated disclosures drafted by Wings and Jetcraft;

(f) working with Wings to incorporate into the RFQ and the Application inaccurate information, including information ascertained through Wings' brokerage of insurance for a separate aircraft for Heidi's principals;

(g) failing to confer with Heidi regarding the inaccurate information and/or misrepresentations in its RFQ and Application and presenting the Application with misrepresentations to Heidi for signature;

(h) failing to ensure that the information set forth in the RFQ and the Application was accurate; and

(i) failing to advise Heidi not to submit the RFQ and the Application to insurers with the misrepresentations contained therein.

86. When Jetcraft provided the information for and assisted Wings in drafting the RFQ and the Application, Jetcraft was aware, or should have been aware, that these documents included information that was false and that Heidi was relying upon Jetcraft to ensure that its submissions to prospective insurers, including XL, were accurate and would result in procuring valid insurance.

87. As a direct and proximate result of the aforesaid actions, misstatements, errors, and omissions by Jetcraft, Heidi has sustained actual damages in an amount to be proven at trial.

## COUNT IV
### (Negligence Against Wings)

88. Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

89.     Wings describes itself to the public as the "most knowledgeable, results oriented, and genuine aviation professionals in the business."

90.     In or about February 1, 2016, Heidi, through Jetcraft, engaged Wings to procure insurance coverage for the Dornier. Heidi specifically requested that Wings procure insurance for the Dornier that would provide coverage for any possible claims or losses related to its operations abroad, including in Africa.

91.     Wings accepted Heidi's request and agreed to act and did act as Heidi's aviation insurance broker for the purpose of procuring insurance coverage for the Dornier.

92.     By agreeing to do so, Wings undertook a duty to Heidi to act in good faith and exercise reasonable skill, care, and diligence in advising Heidi about and procuring the requested insurance coverage. In its capacity as an insurance broker, Wings had an obligation and a duty to advise Heidi with respect to its submissions to prospective insurers, including XL, and to broker valid insurance coverage for the Dornier. Wings was obligated to exercise reasonable care in completing these undertakings.

93.     During the course of Heidi's relationship with Wings, Heidi had a right to rely upon Wings' expert knowledge regarding aviation and insurance coverage.

94.     Wings failed to exercise reasonable care in preparing Heidi's submissions to prospective insurers, including XL; in advising Heidi regarding those submissions; and in brokering valid insurance for the Dornier. Among other acts as discovery may reveal, Wings breached its duty to exercise reasonable care by:

> (a)     failing to advise Heidi regarding the meaning of the terms "Base Airport" and "Use" in the Application and Renewal Application forms;
>
> (b)     failing to advise Heidi regarding how to correctly respond to the questions in the Application and Renewal Application forms regarding "Base Airport" and "Use;"

(c)    furnishing the information regarding the Dornier's "Base Airport" and "Use" that was included in the RFQ, the Application, and the Renewal Application and which included misrepresentations;

(d)    presenting, in coordination with Jetcraft, the pre-populated Application form (and later the Renewal Application) with misrepresentations regarding the Dornier's "Base Airport" and "Use" to Heidi for signature and misrepresenting to Heidi that the information contained in those forms was appropriate to submit to XL;

(e)    failing to correctly analyze the Dornier's "Base Airport" and "Use" and inquire to Heidi as to whether its RFQ, Application, and Renewal Application should be amended or supplemented to modify the pre-populated disclosures drafted by Wings;

(f)    incorporating into the RFQ, the Application, and the Renewal Application inaccurate information, including information ascertained through Wings' brokerage of insurance for a separate aircraft for Heidi's principals;

(g)    failing to confer with Heidi regarding the inaccurate information and/or misrepresentations in its RFQ, the Application, and the Renewal Application and presenting the Application and Renewal Application with misrepresentations to Heidi for signature;

(h)    failing to ensure that the information set forth in the RFQ, the Application, and the Renewal Application was accurate; and

(i)    failing to advise Heidi not to submit the RFQ, the Application, and the Renewal Application to insurers with the misrepresentations contained therein.

95.    When Wings drafted the RFQ, the Application, and the Renewal Application, Wings was aware, or should have been aware, that these documents included information that was false and that Heidi was relying upon Wings to ensure that its submissions to prospective insurers, including XL, were accurate and would result in procuring valid insurance.

96.    As a direct and proximate result of the aforesaid actions, errors and omissions by Wings, Heidi has sustained actual damages in an amount to be proven at trial.

## COUNT V
### (Negligent Misrepresentation Against Jetcraft)

97.     Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

98.     Jetcraft agreed to serve as Heidi's aviation broker in connection with Heidi's acquisition of the Dornier.  In undertaking to facilitate Heidi's acquisition of the Dornier, Jetcraft further agreed to undertake efforts to procure insurance on Heidi's behalf (and in order to close a transaction in which it had a pecuniary interest) including coordinating with Wings to provide information to prospective insurers during the underwriting process.  In this capacity, Jetcraft owed Heidi a duty to obtain insurance coverage that would in fact cover a prospective loss and to accurately advise Heidi regarding such coverage and in the underwriting process.

99.     In its capacity as Heidi's aviation broker, Jetcraft had an obligation and a duty to convey information pertaining to Heidi's aviation insurance to Heidi with reasonable care.

100.    Jetcraft failed to exercise reasonable care both in analyzing and drafting the content of the RFQ and the Application and in conveying information to Heidi regarding those submissions.

101.    Among other misrepresentations or omissions as discovery may reveal, Jetcraft breached its duty to exercise reasonable care by:

    (a)     Misrepresenting the Aircraft's "Base Airport" and "Use" in written submissions to prospective insurers of Heidi (including, but not limited to the RFQ and the Application), including XL;

    (b)     Misrepresenting to Heidi that the representations in its written submissions to prospective insurers (including, but not limited to the RFQ and the Application), including XL, were accurate and appropriate; and

    (c)     Misrepresenting to Heidi that Heidi had secured valid insurance with XL through the Initial Policy that would respond to a covered loss, such as Heidi's claim based upon the Belly Landing.

102.     The misrepresentations and omissions referred to in paragraph 101 above were made in e-mails and telephone communications, including, but not limited to e-mails by and among Heidi principal Melissa Bates; Wings employees Ryan Konrath, Jeff Dalton, and Tom Hauge; and Dan Dunn of Jetcraft dated March 8–12, 2016.

103.     When Jetcraft drafted the RFQ, the Application, and other submissions, and presented, with Wings, the Application to Heidi for signature, Jetcraft was aware or should have been aware that certain statements therein were false, that Heidi had not been provided any guidance regarding the meaning of the terms in those documents or the accuracy of the statements therein regarding the Dornier, and that Heidi was relying on Jetcraft's expertise in the aviation field and on Jetcraft's advice in executing the Application as drafted and presented to Heidi for signature.

104.     The misrepresentations regarding the Dornier in the submissions to Heidi's prospective insurers were material, as were the misrepresentations and/or omissions that Jetcraft made to Heidi regarding the accuracy of the information in Heidi's submissions to insurers. Had Heidi been aware that the information included in the submissions to insurers prepared by Jetcraft was inaccurate and would jeopardize its insurance, it would have corrected any inaccurate statements and secured valid insurance from XL or another insurance carrier (Heidi had previously procured and paid for insurance for its other aircraft operated in Africa). But Heidi was led to believe through Jetcraft's misstatements and/or omissions that the Application included information that was accurate and appropriate for submission to prospective insurers. Accordingly, Heidi signed the Application without modifying the information included therein. XL would later rely upon the RFQ, the Application, and the misrepresentations therein as the basis for its rescission of the Renewal Policy.

105.    Heidi reasonably relied on Jetcraft's faulty advice and misrepresentations when signing the Application prepared by Jetcraft, having been led to believe by Jetcraft's misstatements and/or omissions that the information contained in the Application was accurate and appropriate to submit to XL.

106.    As a direct and proximate result of the aforesaid actions, misstatements, errors, and omissions by Jetcraft, Heidi has sustained actual damages in an amount to be proven at trial.

## COUNT VI
### (Negligent Misrepresentation Against Wings)

107.    Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

108.    Wings agreed to serve as Heidi's aviation insurance broker in connection with securing insurance coverage for the Dornier. In undertaking to procure such coverage, Wings owed Heidi a duty to obtain insurance coverage that would in fact cover a loss and to accurately advise Heidi regarding such coverage and in the underwriting process.

109.    In its capacity as an insurance broker, Wings had an obligation and a duty to convey information pertaining to Heidi's insurance to Heidi with reasonable care.

110.    Wings failed to exercise reasonable care both in analyzing and drafting the content of the RFP, the Application, and the Renewal Application and in conveying information to Heidi regarding those submissions.

111.    Among other misrepresentations as discovery may reveal, Wings breached its duty to exercise reasonable care by:

        (a)    Misrepresenting the Aircraft's "Base Airport" and "Use" in written and oral submissions to prospective insurers of Heidi (including, but not limited to the RFQ, the Application, and the Renewal Application), including XL;

(b)     Misrepresenting to Heidi that the representations in its oral and written submissions to prospective insurers (including, but not limited to the RFQ, the Application, and the Renewal Application) including XL, were accurate and appropriate; and

(c)     Misrepresenting to Heidi that it had placed valid insurance with XL through the Initial Policy and the Renewal Policy that would respond to a covered loss, such as Heidi's claim based upon the Belly Landing.

112.    The misrepresentations and omissions referred to in paragraph 111 above were made in e-mails and telephone communications, including, but not limited to: (1) e-mails by and among Heidi principal Melissa Bates; Wings employees Ryan Konrath, Jeff Dalton, and Tom Hauge; and Dan Dunn of Jetcraft dated March 8–12 2016; and (2) e-mails by and among Heidi principal Melissa Bates and Wings employees Tom Hauge, Jeff Dalton, and Christine Lickteig dated December 10–23, 2016 and February 15, 2017.

113.    When Wings drafted the RFQ, the Application, and the Renewal Application and presented the Application and the Renewal Application to Heidi for signature, Wings was aware or should have been aware that certain statements therein were false, that Heidi had not been provided any guidance regarding the meaning of the terms in those documents or the accuracy of the statements therein regarding the Dornier, and that Heidi was relying on Wings' expertise in the aviation insurance field and on Wings' advice in executing the Application and the Renewal Application as drafted and presented to Heidi for signature.

114.    The misrepresentations regarding the Dornier in the submissions to Heidi's prospective insurers were material, as were the misrepresentations and/or omissions that Wings made to Heidi regarding the accuracy of the information in its submissions to insurers. Had Heidi been informed that the information included in the submissions to insurers prepared by Wings was inaccurate and would jeopardize its insurance, it would have corrected any inaccurate statements and secured valid insurance from XL or another insurance carrier (Heidi had

28

previously procured and paid for insurance for its other aircraft operated in Africa). But Heidi was led to believe through Wings' misstatements and/or omissions that the Application and the Renewal Application Wings had prepared included information that was accurate and appropriate for submission to prospective insurers. Accordingly, Heidi signed the Application and the Renewal Application without modifying the information included therein by Wings. XL would later rely upon the Application and the Renewal Application and the misrepresentations therein as the basis for its rescission of the Renewal Policy.

115.    Heidi reasonably relied on Wings' faulty advice and misrepresentations when signing the Application and the Renewal Application forms drafted by Wings, having been led to believe by Wings' misstatements and/or omissions that the information contained in the Application and the Renewal Application were accurate and appropriate to submit to XL.

116.    As a direct and proximate result of the aforesaid actions, misstatements, errors, and omissions by Wings, Heidi has sustained actual damages in an amount to be proven at trial.

### COUNT VII
### (Fraudulent Representation Against Jetcraft)

117.    Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

118.    Among other misrepresentations or omissions as discovery may reveal, Jetcraft:

    (a)    Misrepresented the Aircraft's "Base Airport" and "Use" in written submissions to prospective insurers of Heidi (including, but not limited to the RFQ and the Application), including XL;

    (b)    Misrepresented to Heidi that the representations in its written submissions to prospective insurers (including, but not limited to the RFQ and the Application), including XL, were accurate and appropriate; and

    (c)    Misrepresented to Heidi that Heidi had secured valid insurance with XL through the Initial Policy that would respond to a covered loss, such as Heidi's claim based upon the Belly Landing.

119.    The misrepresentations and omissions referred to in paragraph 118 above were made in e-mails and telephone communications, including, but not limited to e-mails by and among Heidi principal Melissa Bates; Wings employees Ryan Konrath, Jeff Dalton, and Tom Hauge; and Dan Dunn of Jetcraft dated March 8–12, 2016.

120.    When Jetcraft furnished information to Wings and participated in the drafting of the RFQ, the Application, and other submissions, and presented, with Wings, the Application to Heidi for signature, Jetcraft was aware that certain statements therein were false, that Heidi had not been provided any guidance regarding the meaning of the terms in those documents or the accuracy of the statements therein regarding the Dornier, and that Heidi was relying on Jetcraft's expertise in the aviation field and on Jetcraft's advice in executing the Application as drafted and presented to Heidi for signature.

121.    Jetcraft's misrepresentations to Heidi and its prospective insurers were knowingly and intentionally made with intent to induce Heidi's reliance. Jetcraft was aware of the challenges Heidi had faced in insuring prior aircraft operations abroad and wanted to facilitate a prompt insurance placement for the Dornier (notwithstanding its operation abroad) for Heidi so that it could proceed with closing Heidi's acquisition of the Dornier and sale of Heidi's former plane to Jetcraft—a lucrative transaction. Jetcraft also knew that it would be easier to place insurance for the Dornier if the "Base Airport" was identified as Dulles-IAD and its "Use" was described as "Corp./Industrial Aid." Accordingly, to effectuate an easier insurance placement, Jetcraft misrepresented and/or omitted any concern to Heidi regarding the accuracy of the representations in Heidi's submissions to prospective insurers to induce Heidi to execute the Application and finalize the transaction.

30

122.    The misrepresentations regarding the Dornier in the submissions to Heidi's prospective insurers were material, as were the misrepresentations and/or omissions that Jetcraft made to Heidi regarding the accuracy of the information in Heidi's submissions to insurers. Had Heidi been aware that the information included in the submissions to insurers prepared by Jetcraft was inaccurate and would jeopardize its insurance, it would have corrected any inaccurate statements and secured valid insurance from XL or another insurance carrier (Heidi had previously procured and paid for insurance for its other aircraft operated in Africa). But Heidi was led to believe through Jetcraft's misstatements and/or omissions that the Application Jetcraft had prepared included information that was accurate and appropriate for submission to prospective insurers. Accordingly, Heidi signed the Application without modifying the information included therein by Jetcraft. XL would later rely upon the RFQ, the Application, and the misrepresentations therein as the basis for its rescission of the Renewal Policy.

123.    Heidi reasonably relied on Jetcraft's faulty advice and misrepresentations when signing the Application prepared by Jetcraft, having been led to believe by Jetcraft's misstatements and/or omissions that the information contained in the Application was accurate and appropriate to submit to XL.

124.    As a direct and proximate result of the aforesaid actions, misstatements, errors, and omissions by Jetcraft, Heidi has sustained actual damages in an amount to be proven at trial.

## COUNT VIII
### (Fraudulent Misrepresentation Against Wings)

125.    Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

126.    Among other misrepresentations as discovery may reveal, Wings:

    (a)    Misrepresented the Aircraft's "Base Airport" and "Use" in written and oral submissions to prospective insurers of Heidi (including, but not

31

limited to the RFQ, the Application, and the Renewal Application), including XL;

(b)   Misrepresented to Heidi that the representations in its oral and written submissions to prospective insurers (including, but not limited to the RFQ, the Application, and the Renewal Application) including XL, were accurate and appropriate; and

(c)   Misrepresented to Heidi that it had placed valid insurance with XL through the Initial Policy and the Renewal Policy that would respond to a covered loss, such as Heidi's claim based upon the Belly Landing.

127.    The misrepresentations and omissions referred to in the paragraph 126 above were made in e-mails and telephone communications, including, but not limited to: (1) e-mails by and among Heidi principal Melissa Bates; Wings employees Ryan Konrath, Jeff Dalton, and Tom Hauge; and Dan Dunn of Jetcraft dated March 8–12, 2016; and (2) e-mails by and among Heidi principal Melissa Bates and Wings employees Tom Hauge, Jeff Dalton, and Christine Lickteig dated December 10–23, 2016 and February 15, 2017.

128.    When Wings drafted the RFQ, the Application, the Renewal Application and other submissions, and presented the Application and Renewal Application to Heidi for signature, Wings was aware that certain statements therein were false, that Heidi had not been provided any guidance regarding the meaning of the terms in those documents or the accuracy of the statements therein regarding the Dornier, and that Heidi was relying on Wings' expertise in the aviation field and on Wings' advice in executing the Application and Renewal Application as drafted and presented to Heidi for signature.

129.    Wings' misrepresentations to Heidi and its prospective insurers were knowingly and intentionally made with intent to induce Heidi's reliance. Wings was aware of the challenges Heidi had faced in insuring prior aircraft operations abroad and wanted to facilitate a prompt insurance placement for the Dornier and secure its commission arising therefrom. Wings also knew that it would be easier to place insurance for the Dornier if the "Base Airport" was

identified as Dulles-IAD and its "Use" was described as "Corp./Industrial Aid."  Accordingly, to effectuate an easier insurance placement, Wings misrepresented and/or omitted any concern to Heidi regarding the accuracy of the representations in Heidi's submissions to prospective insurers.

130.    The misrepresentations regarding the Dornier in the submissions to Heidi's prospective insurers were material, as were the misrepresentations and/or omissions that Wings made to Heidi regarding the accuracy of the information in Heidi's submissions to insurers.  Had Heidi been aware that the information included in the submissions to insurers prepared by Wings was inaccurate and would jeopardize its insurance, it would have corrected any inaccurate statements and secured valid insurance from XL or another insurance carrier (Heidi had previously procured and paid for insurance for its other aircraft operated in Africa).  But Heidi was led to believe through Wings' misstatements and/or omissions that the Application Wings had prepared included information that was accurate and appropriate for submission to prospective insurers.  Accordingly, Heidi signed the Application and the Renewal Application without modifying the information included therein by Wings.  XL would later rely upon the RFQ, the Application, the Renewal Application, and the misrepresentations therein as the basis for its rescission of the Renewal Policy.

131.    Heidi reasonably relied on Wings' faulty advice and misrepresentations when signing the Application prepared by Wings, having been led to believe by Wings' misstatements and/or omissions that the information contained in the Application was accurate and appropriate to submit to XL.

132.    As a direct and proximate result of the aforesaid actions, misstatements, errors, and omissions by Wings, Heidi has sustained actual damages in an amount to be proven at trial.

33

## COUNT NINE
### (For Breach of Fiduciary Duty Against Jetcraft)

133. Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

134. Through its dealings and interactions with Heidi, Jetcraft, including its manager on the Heidi account, Mr. Dan Dunn, developed a special relationship of trust and confidence with Heidi. In addition to their engagement with respect to acquiring the Dornier, Heidi, and its principals, had worked with Jetcraft and Mr. Dunn before in purchasing other aircraft. Jetcraft and Mr. Dunn had a long-standing business relationship with Heidi that existed for years prior to Jetcraft's work in facilitating Heidi's purchase of the Dornier and in procuring insurance for the Dornier.

135. Heidi trusted Jetcraft and relied upon Jetcraft to provide sound advice pertaining to Heidi's insurance program for the Dornier, and other aircraft, including with respect to Heidi's applications and other submissions to insurers.

136. Jetcraft understood that Heidi trusted and relied upon Jetcraft to provide sound advice.

137. Jetcraft owed fiduciary duties to Heidi, including the duty to exercise good faith and reasonable diligence and duties of loyalty and faithfulness, when procuring Heidi's aviation insurance for the Dornier.

138. Among other acts as discovery may reveal, Jetcraft breached the fiduciary duties it owed to Heidi by:

      (a)    failing to advise Heidi regarding the meaning of the terms "Base Airport" and "Use" in the Application;

      (b)    failing to advise Heidi regarding how to correctly respond to the questions in the Application regarding "Base Airport" and "Use;"

(c)    furnishing the information regarding the Dornier's "Base Airport" and "Use" that was included in the RFQ, the Application, and the Renewal Application and which included misrepresentations;

(d)    presenting, in coordination with Wings, the pre-populated Application form with misrepresentations regarding the Dornier's "Base Airport" and "Use" to Heidi for signature and misrepresenting to Heidi that the information contained therein was appropriate to submit to XL;

(e)    failing to correctly analyze the Dornier's "Base Airport" and "Use" and inquire to Heidi as to whether its RFQ and Application should be amended or supplemented to modify the pre-populated disclosures drafted by Wings and Jetcraft;

(f)    working with Wings to incorporate into the RFQ and the Application inaccurate information, including information ascertained through Wings' brokerage of insurance for a separate aircraft for Heidi's principals;

(g)    failing to confer with Heidi regarding the inaccurate information and/or misrepresentations in its RFQ and Application and presenting the Application with misrepresentations to Heidi for signature;

(h)    failing to ensure that the information set forth in the RFQ and the Application was accurate; and

(i)    failing to advise Heidi not to submit the RFQ and the Application to insurers with the misrepresentations contained therein.

139.    As a direct and proximate result of the aforesaid actions, misstatements, errors, and omissions by Jetcraft, Heidi has sustained actual damages in an amount to be proven at trial.

## COUNT TEN
### (For Breach of Fiduciary Duty Against Wings)

140.    Heidi restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

141.    Through its dealings and interactions with Heidi, Wings, including its account executive, Mr. Tom Hauge, developed a special relationship of trust and confidence with Heidi. In addition to their engagement to procure insurance for the Dornier, Wings had previously worked with Heidi in procuring insurance for other aircraft. Wings and its relationship manager

for the Heidi account, Mr. Hauge, had a long-standing business relationship with Heidi that existed for years prior to Wings' work in connection with procuring insurance for the Dornier.

142.   Heidi trusted Wings and relied upon Wings to provide sound advice pertaining to Heidi's insurance program for the Dornier, and other aircraft, including with respect to Heidi's applications and other submissions to insurers, including XL.

143.   Wings understood that Heidi trusted and relied upon Wings to provide sound advice.

144.   Wings owed fiduciary duties to Heidi, including the duty to exercise good faith and reasonable diligence and duties of loyalty and faithfulness, when brokering Heidi's aviation insurance for the Dornier.

145.   Among other acts as discovery may reveal, Wings breached the fiduciary duties it owed to Heidi by:

        (a)   failing to advise Heidi regarding the meaning of the terms "Base Airport" and "Use" in the Application and Renewal Application forms;

        (b)   failing to advise Heidi regarding how to correctly respond to the questions in the Application and Renewal Application forms regarding "Base Airport" and "Use;"

        (c)   furnishing the information regarding the Dornier's "Base Airport" and "Use" that was included in the RFQ, the Application, and the Renewal Application and which included misrepresentations;

        (d)   presenting, in coordination with Jetcraft, the pre-populated Application form (and later the Renewal Application) with misrepresentations regarding the Dornier's "Base Airport" and "Use" to Heidi for signature and misrepresenting to Heidi that the information contained in those forms was appropriate to submit to XL;

        (e)   failing to correctly analyze the Dornier's "Base Airport" and "Use" and inquire to Heidi as to whether its RFQ, Application, and Renewal Application should be amended or supplemented to modify the pre-populated disclosures drafted by Wings;

(f)    incorporating into the RFQ, the Application, and the Renewal Application inaccurate information, including information ascertained through Wings' brokerage of insurance for a separate aircraft for Heidi's principals;

(g)    failing to confer with Heidi regarding the inaccurate information and/or misrepresentations in its RFQ, the Application, and the Renewal Application and presenting the Application and Renewal Application with misrepresentations to Heidi for signature;

(h)    failing to ensure that the information set forth in the RFQ, the Application, and the Renewal Application was accurate; and

(i)    failing to advise Heidi not to submit the RFQ, the Application, and the Renewal Application to insurers with the misrepresentations contained therein.

146.    As a direct and proximate result of the aforesaid actions, errors, and omissions by Wings, Heidi has sustained actual damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Heidi respectfully requests an order and relief as follows:

a.    As to the First Count, Heidi respectfully requests monetary damages against Jetcraft in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

b.    As to the Second Count, Heidi respectfully requests monetary damages against Wings in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

c.    As to the Third Count, Heidi respectfully requests monetary damages against Jetcraft in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

37

d.      As to the Fourth Count, Heidi respectfully requests monetary damages against Wings in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

e.      As to the Fifth Count, Heidi respectfully requests monetary damages against Jetcraft in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

f.      As to the Sixth Count, Heidi respectfully requests monetary damages against Wings in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

g.      As to the Seventh Count, Heidi respectfully requests monetary damages against Jetcraft in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

h.      As to the Eighth Count, Heidi respectfully requests monetary damages against Wings in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

i.      As to the Ninth Count, Heidi respectfully requests monetary damages against Jetcraft in an amount exceeding $75,000.00, the amount to be determined at trial and to include

all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

    j.    As to the Tenth Count, Heidi respectfully requests monetary damages against Wings in an amount exceeding $75,000.00, the amount to be determined at trial and to include all available incidental, actual, consequential, compensatory and punitive damages, as well as such other appropriate damages and relief permitted by law;

    k.    As to all counts, awarding Heidi its attorneys' fees and costs of suit;

    l.    As to all counts, awarding Heidi pre-judgment interest and post-judgment interest; and

    m.    As to all counts, awarding Heidi any other and further relief as this Court deems just and proper.

## JURY DEMAND

    Heidi requests a jury trial on all claims so triable as of right.

Dated: May 29, 2020

                                  */s/ W. Hunter Winstead*
                                    W. Hunter Winstead (D.C. Bar No. 496430)
                                    GILBERT LLP
                                    700 Pennsylvania Avenue, SE, Suite 400
                                    Washington, DC 20003
                                    Telephone:  (202) 772-2344
                                    Email:  winsteadh@gilbertlegal.com

                                    *Attorney for Plaintiff Heidi Aviation, LLC*



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
Civil Actions Branch
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
Telephone: (202) 879-1133 Website: www.dccourts.gov

Heidi Aviation, LLC
_____
                                    Plaintiff

                    vs.                                              Case Number   2020 CA 002640 B

Jetcraft Corporation
_____
                                    Defendant

### SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either
personally or through an attorney, within twenty one (21) days after service of this summons upon you,
exclusive of the day of service. If you are being sued as an officer or agency of the United States Government
or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your
Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The
attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed
to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue,
N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on
Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on
the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer,
judgment by default may be entered against you for the relief demanded in the complaint.

W. Hunter Winstead
_____
Name of Plaintiff's Attorney                                  Clerk of the Court

700 Pennsylvania Avenue, SE, Suite 400
_____      By _____
Address                                                                      Deputy Clerk
Washington, DC 20003

(202) 772-2344
_____      Date   06/01/2020
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오.      የአማርኛ ትርጉም ለማግኘት (202) 879-4828      ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU
ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT
MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE
COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR
REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS
ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the
Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500
Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Telephone: (202) 879-1133 • Website: www.dccourts.gov

HEIDI AVIATION, LLC
    Vs.                                  C.A. No.      2020 CA 002640 B
JETCRAFT CORPORATION et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                       Chief Judge Robert E. Morin

Case Assigned to: Judge KELLY A HIGASHI
Date:  June 1, 2020
Initial Conference: 9:30 am, Friday, August 28, 2020
Location:  Courtroom JM-4
              500 Indiana Avenue N.W.
              WASHINGTON, DC 20001

                                                                     CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin