**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| HEIDI AVIATION, LLC, |
| Plaintiff |
| v. |
| JETCRAFT CORPORATION, |
| Defendant |

Civil Action No. 20-1773 (CKK)

**MEMORANDUM OPINION**
(November 15, 2021)

Plaintiff Heidi Aviation LLC ("Heidi") brings this action against Defendant Jetcraft Corporation ("Jetcraft"). After an airplane sold by Jetcraft to Heidi sustained damage in a crash landing, Heidi's insurer declined to cover Heidi's loss and sued Heidi to rescind the applicable insurance policy. Heidi attributes its insurer's failure to pay for its loss to incorrect or false information allegedly provided by Jetcraft to the insurer regarding the use and base airport of the airplane. Heidi now asserts claims for breach contract, negligence, negligent misrepresentation, fraudulent misrepresentation, and breach of fiduciary duty against Jetcraft.

Pending before the Court is Jetcraft's [22] Motion to Dismiss the Complaint, in which Jetcraft contends that Heidi fails to state a plausible claim for relief. Upon review of the pleadings,[1]

---

[1] The Court's consideration has focused on the following:
- Complaint ("Compl."), ECF No. 1-1;
- Memorandum in Support of Defendant Jetcraft Corporation's Motion to Dismiss ("Def.'s Mot."), ECF No. 22-1;
- Memorandum in Opposition to Defendant Jetcraft Corporation's Motion to Dismiss ("Pl.'s Opp'n"), ECF No. 27; and
- Reply in Support of Defendant Jetcraft Corporation's Motion to Dismiss ("Def.'s Reply"), ECF No. 32.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

the relevant legal authority, and the record as a whole, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Jetcraft's Motion to Dismiss.  Specifically, the Court **GRANTS** Jetcraft's motion to dismiss regarding Heidi's breach of contract claim (Count 1), but **DENIES** Jetcraft's motion with respect to all other claims.

## I.      BACKGROUND

For the purposes of the present motion to dismiss, the Court accepts as true the well-pleaded allegations in Heidi's Complaint.  The Court does "not accept as true, however, the plaintiff's legal conclusions or inferences that are unsupported by the facts alleged."  *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (citation omitted).

Plaintiff Heidi Aviation LLC ("Heidi") is a Delaware holding company that operates on behalf of Bancroft, a "management and development company" headquartered in Washington, D.C.  Compl. ¶ 4.  Bancroft is owned by Bancroft Global Development, LLC and Bancroft Global Investments, both Delaware entities.  *Id.*  Bancroft functions "in part, as a not-for-profit non-government organization that works to provide stability in conflict areas throughout the world," manages "complex projects across the world, including in Afghanistan, Kenya, Libya, Somalia, Uganda, and the United Arab Emirates," and uses several aircraft "owned and operated by Heidi" to support those projects.  *Id.* ¶¶ 4, 13.

Defendant Jetcraft Corporation ("Jetcraft") is a North Carolina corporation that serves as a "broker" to "facilitat[e] the acquisition of private aircraft."  *Id.* ¶ 5.  As detailed below, Jetcraft provided Heidi "aircraft selection and acquisition services" to assist its efforts to procure a "Mid Size Turbine Corporate Aircraft" in 2015, and ultimately sold to Heidi a 2001 Dornier 328-300 (the "Dornier") from its own inventory in early 2016.  *Id.* ¶¶ 10, 14–17.  Before this sale, Jetcraft

had "previously worked with Heidi's principals to acquire other aircraft owned by Heidi . . . which were operated predominantly in Africa." *Id.* ¶ 11.

Defendant Wings Insurance Agency, Inc. ("Wings"), a Minnesota corporation, is an insurance broker specializing in "placing aviation insurance coverage." *Id.* ¶ 6. Pursuant to an oral agreement, Wings served as Heidi's insurance broker to obtain coverage for the Dornier. *Id.* ¶ 20. Wings is no longer a party in this action, having been dismissed from the case pursuant to a Stipulation of Dismissal with Heidi. *See* Stip., ECF No. 34; Order, ECF No. 35.

This action arises from Heidi's claim that Jetcraft and Wings supplied incorrect information to XL Specialty Insurance Company ("XL"), which provided the insurance policy for the Dornier. Based on that incorrect information, XL did not pay Heidi for damage sustained by the Dornier after it made a crash landing and sued Heidi to rescind the policy. The Court shall next recount in greater detail the factual allegations underlying Heidi's claims in this case.

**A. Heidi Purchases the Dornier from Jetcraft.**

On August 3, 2015, Heidi and Jetcraft entered into an Acquisition Services Agreement ("ASA"), pursuant to which Jetcraft agreed to assist Heidi in procuring a "Mid Size . . . Corporate Aircraft." *Id.* ¶ 10; Def.'s Mot. Ex. 1, ASA at 1, ECF No. 22-3.[2] In its role as an "independent contractor," ASA § 1.4, Jetcraft agreed to "use its best efforts to evaluate the marketplace, assess aircraft," and provide Heidi with "verbal and/or written evaluations and recommendations for such aircraft," *id.* § 1.1. Jetcraft's "services" under the ASA "shall include, but are not limited to, negotiations with third-parties on behalf and with the direction of [Heidi], coordinating and supervising demonstration flights, conducting or facilitating pre-purchase due diligence, and

---

[2] The Court may consider the content of the ASA between Jetcraft and Heidi without converting Jetcraft's motion to dismiss to a motion for summary judgment because it is "referred to in the complaint" and "central to the plaintiff's claim[s]." *Strumsky v. Wash. Post Co.*, 842 F. Supp. 2d 215, 217–18 (D.D.C. 2012); *see, e.g.*, Compl. ¶¶ 10, 70.

assisting [Heidi] in completing and filing documentation necessary [to] implement a lease or purchase of an identified aircraft."  *Id.*  Jetcraft further promised to "act in a manner consistent with [Heidi's] bests interests."  *Id.*  The parties agreed that the ASA would remain in effect "until an Aircraft is acquired," unless sooner terminated by the parties.  *Id.* § 2.1.

In early 2016, Jetcraft identified an aircraft from its own inventory, the Dornier, as a potential purchase for Heidi.  Compl. ¶¶ 14–17.  On January 25, 2016, Heidi and Jetcraft executed an Aircraft Purchase Agreement ("APA"), in which Heidi agreed to purchase the Dornier from Jetcraft.  *Id.* ¶ 17; Def.'s Mot. Ex. 2, APA, ECF No. 23-3.[3]  The APA contains ████████ ███████████████████████████████████████████████████ nor does it contain ███████ ████████████████████████████████████████████  However, Heidi alleges that it "would not finalize a transaction to acquire the Dornier without having insurance in place," claiming that this gave Jetcraft a "pecuniary incentive to place coverage for the Dornier so that Heidi would finalize the deal."  Compl. ¶ 16.

**B. Heidi Obtains an Insurance Policy for the Dornier.**

Heidi alleges that in February 2016 (after the execution of the APA), a Jetcraft employee contacted Wings "on behalf of Heidi" to request that Wings "serve as Heidi's aviation insurance broker and procure insurance coverage for the Dornier."  *Id.* ¶ 18.  Wings "orally agreed that day" to act as Heidi's insurance broker for the purpose of procuring the requested aviation insurance.  *Id.* ¶ 20.  It is unclear from the Complaint whether Wings made such an oral agreement with Heidi or with Jetcraft.  *See id.*  Heidi alleges, however, that Wings thereafter "act[ed] as Heidi's insurance broker in connection with procuring insurance coverage for the Dornier," and that Wings "would be paid a compensation upon successful placement of insurance coverage[.]"  *Id.* ¶¶ 20–21.

---

[3] The Court may consider the content of the APA without converting Jetcraft's motion to dismiss to one for summary judgment for the same reason noted *supra* note 2; *see, e.g.*, Compl. ¶ 17.

According to Heidi, "Jetcraft and/or Wings" communicated directly with prospective insurers on Heidi's behalf. *Id.* ¶ 26. To obtain coverage for the Dornier, Wings and Jetcraft, "using information provided by Jetcraft," generated an "Aircraft Request for Quote" ("RFQ") to submit to potential insurers. *Id.* ¶ 28. The RFQ indicated that the Dornier's "Use" was "industrial aid" and that the Dornier's "Base" would be Dulles Airport ("IAD") in Virginia. *Id.* ¶ 30.

On February 4, 2016, Wings (not Jetcraft) distributed the RFQ and received inquiries from prospective insurers. *Id.* ¶ 29. Based on the RFQ, XL provided an insurance quote to Heidi, which Heidi accepted on March 8, 2016. *Id.* ¶¶ 33–34. XL issued an "Aviation Hull & Liability Policy" for the period of March 9, 2016 through March 9, 2017 (the "Initial Policy"). *Id.* ¶ 34.

In December 2016, anticipating the expiration of the Initial Policy, Wings requested that Heidi complete a Renewal Application for Insurance ("Renewal Application") to renew its insurance policy for the period from March 9, 2017 to March 9, 2018. *Id.* ¶ 40. Heidi alleges that Wings "populated" the information in the Renewal Application, which included the same information as the RFQ regarding the Dornier's "Use" (industrial aid) and "Base" (Dulles Airport). *Id.* Heidi signed the Renewal Application without any modification on December 13, 2016. *Id.* ¶ 41. Wings submitted Heidi's Renewal Application to XL on December 23, 2016. *Id.* ¶ 42. On February 16, 2017, Wings requested that XL bind coverage for an additional policy year, with the same terms as the Initial Policy. *Id.* ¶ 43. XL issued a Renewal Policy, which became effective on March 9, 2017. *Id.* ¶ 44.

## C. XL Seeks Rescission of the Renewal Policy after the Dornier Sustains Damage.

On May 30, 2017, the Dornier experienced a landing gear malfunction, which forced the pilot to complete a "belly landing" at the Aden Adde International Airport in Mogadishu, Somalia, causing damage to the aircraft. *Id.* ¶ 52. Heidi, through Wings, notified XL about the incident and its claim for insurance coverage under the Renewal Policy. *Id.* ¶ 53. The incident was treated by

Heidi and XL as a "Total Loss" under the Renewal Policy, which Heidi contends should have "resulted in, at a minimum, a $2.4 million payment." *Id.* ¶ 57. On June 22, 2017, XL acknowledged that the Dornier "sustained physical damage . . . as defined by the Policy," but also requested additional information about "the location and use of the Aircraft during the past fourteen months." *Id.* ¶ 58. Heidi provided responsive information to XL. *Id.*

On September 8, 2017, XL advised Heidi that it was "rescinding" the Renewal Policy and denied coverage for the damage sustained by the Dornier as a result of the belly landing. *Id.* ¶ 59. XL filed a rescission action against Heidi in the Superior Court of the District of Columbia ("D.C. Superior Court") on September 11, 2017. *Id.* ¶ 61. Heidi claims that XL's denial of coverage and rescission were "based solely upon [XL's] contention that the Aircraft had not been operated as represented to XL during the procurement and underwriting of the Renewal Policy." *Id.* ¶ 59. Specifically, according to Heidi, the statements contained in "the RFQ, the Application [for the Initial Policy], and the Renewal Application" regarding the Aircraft's 'Base Airport' and 'Use' . . . were false, and materially impacted XL's decision to issue the Initial Policy, the Renewal Policy, and the terms offered." *Id.* Jetcraft notes that XL's rescission action against Heidi in D.C. Superior Court alleged not only that the "Use" and "Base Airport" information was incorrect, but also that XL's insurance policy was based on additional incorrect representations that the Dornier would not be used for any purpose "for which a charge is made" or for any purpose "other than the transportation of a person." Def.'s Mot. at 7–8; Def.'s Mot. Ex. 3, Joint Pretrial Stmt. of Agreed-Upon Facts ¶¶ 61, 62, *XL Specialty Ins. Co. v. Heidi Aviation, LLC*, 2017 CA 6278 B (D.C. Super. Ct. Jan, 15, 2019), ECF No. 22-5.[4]

---

[4] The Court shall take judicial notice of these facts pertaining to XL's rescission action against Heidi in D.C. Superior Court because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "[P]ublicly available court filing[s] meet[] these criteria." *Mdewakanton Sioux Indians of Minn. v. Zinke*, 264 F. Supp. 3d 116, 123 n.12 (D.D.C. 2017)

**D.  Procedural Posture.**

Heidi filed this action against Jetcraft and Wings in D.C. Superior Court on May 9, 2020.
*See* Compl.  Defendants subsequently removed the case to this Court, based on the diversity of the
parties.  *See* Notice of Removal, ECF No. 1.  In general terms, Heidi alleges that Jetcraft's and
Wings' "breaches of their contractual obligations and fiduciary duties, wrongful and negligent
conduct, misrepresentations, and misstatements in procuring Heidi's insurance for the Dornier"
caused Heidi to "suffer[ ] substantial damages" because it "did not receive the insurance proceeds
it should have been paid under the terms of the Renewal Policy for its losses arising from the Belly
Landing."  Compl. ¶ 63.  Specifically, Heidi contends that XL's rescission of the Renewal Policy
was based on incorrect information in the RFQ, Insurance Application, and Renewal Application
regarding the Dornier's "Use" and "Base Airport"—information that Heidi claims was provided
and represented to be accurate by Jetcraft and Wings.  *See id.* ¶ 60.

On September 9, 2020, Heidi and Wings notified the Court that they had agreed to a
settlement of Heidi's claims against Wings.  *See* Consent Mot. ¶ 1, ECF No. 21.  Upon receipt of
the [34] Stipulation for Partial Dismissal with Prejudice, the Court dismissed Wings from this
action with prejudice on October 19, 2020.  *See* Order, ECF No. 35.

On September 8, 2020, Jetcraft filed its pending Motion to Dismiss pursuant to Federal
Rules of Civil Procedure 9(b) and 12(b)(6), seeking dismissal of Heidi's remaining claims, which
include: breach of contract (Count 1); negligence (Count 3); negligent misrepresentation (Count

---

(citing *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 15 (D.D.C. 2000), *aff'd*, 75 F. App'x 3 (D.C. Cir. 2003)); *see
also Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70, 84 (D.D.C. 2015)  "A court may take
judicial notice of facts contained in public records of other proceedings[.]").  The Court's judicial notice of
these facts does not convert the pending Motion to Dismiss under Rule 12(b)(6) to a motion for summary
judgment under Rule 56.  *See, e.g.*, *Detroit Int'l Bridge Co.*, 133 F. Supp. 3d at 84 ("In deciding a motion
under Rule 12(b)(6), a court may consider . . . matters about which the court may take judicial notice.").

5); fraudulent misrepresentation (Count 7), and breach of fiduciary duty (Count 9). Jetcraft's motion is now ripe for the Court's consideration.

## II.    LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Courts "do not accept as true, however, the plaintiff's legal conclusions or inferences that are unsupported by the facts alleged." *Ralls Corp.*, 758 F.3d at 315.

When evaluating a Rule 12(b)(6) motion, a court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (citation omitted). "[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Strumsky*, 842 F. Supp. 2d at 217 (citation omitted). Moreover, a court may judicially notice a fact that is not subject to "reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Detroit Int'l Bridge Co.*, 133 F. Supp. 3d at 84  (quoting Fed. R. Evid. 201(b)).

8

**B.  Federal Rule of Civil Procedure 9(b)**

Pursuant to Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Reading Rule 9(b) together with Rule 8's requirement that allegations be 'short and plain,' the D.C. Circuit has required plaintiffs to 'state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud,' and to 'identify individuals allegedly involved in the fraud.'" *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 117 (D.D.C. 2015) (quoting *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)). "[T]he point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015). Accordingly, "Rule 9(b) does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations." *Id.* "In sum, although Rule 9(b) does not require plaintiffs to allege every fact pertaining to every instance of fraud . . . defendants must be able to defend against the charge and not just deny that they have done anything wrong." *Williams*, 389 F.3d at 1259 (internal quotation marks and citation omitted).

## III.  DISCUSSION

**A.  Breach of Contract (Count 1)**

In Count 1 of the Complaint, Heidi alleges that the ASA obligated Jetcraft to "advis[e]" and "assist[]" Heidi in "attempting to procure insurance for the Dornier." Compl. ¶ 70. Heidi claims that Jetcraft breached this contractual duty by failing to "competently advise and assist Heidi in obtaining insurance coverage" and by "submitting documents on Heidi's behalf to XL that contained material misrepresentations, errors, and omissions." *Id.* ¶ 72. Jetcraft seeks

dismissal of this claim, contending that Heidi's Complaint fails to state a plausible claim for relief. For the reasons discussed below, the Court agrees that dismissal of Heidi's breach of contract claim is warranted under Rule 12(b)(6).

To survive a motion to dismiss a breach of contract claim under New York law,[5] the Complaint must allege facts which show "the existence of a contract, the plaintiff's performance pursuant to that contract, the defendants' breach of their obligations pursuant to the contract, and damages resulting from that breach[.]" *Elisa Dreier Reporting Corp. v. Global Naps Networks, Inc.*, 921 N.Y.S.2d 329, 333 (App. Div. 2011). Jetcraft argues that Heidi's breach of contract claim fails as a legal matter because Heidi fails to point to any contractual provision giving rise to the duties Jetcraft purportedly breached—namely, "advising Heidi and assisting Heidi in attempting to procure insurance." Compl. ¶ 70. Upon thorough review of the ASA, the Court has not identified any contractual provision obligating Jetcraft to "assist" or "advise" Heidi in obtaining insurance coverage for the Dornier. Accordingly, Heidi has failed to state a plausible claim for a breach of the ASA. Because the Court agrees that the ASA contains no provision requiring Jetcraft to "advise and assist" Heidi in procuring or maintaining insurance coverage for the Dornier, the Court does not address Jetcraft's remaining arguments in support of dismissal.[6]

---

[5] The parties agree that New York law applies to Heidi's breach of contract claim because the ASA contains a choice-of-law provision indicating that the contract is governed by New York law. *See* Def.'s Mot. at 20 n.4; Pl.'s Opp'n at 24; ASA § 4.10 ("This Agreement shall be governed by and construed in accordance with the laws of New York.").

[6] Jetcraft also argues that the APA ███████████████████████████████████████████████████████████████████████████████████ APA § 8.15. "Under New York law, [i]t is well established that a subsequent contract regarding the same matter will supersede the prior contract." *Applied Energetics, Inc. v. NewOak Cap. Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011). However, the parties dispute whether the "subject matter" of both contracts is the same—the ASA dealt with "acquisition services" whereas the APA addressed the purchase of the Dornier. The Court shall not address this point, because even taking Plaintiff's view that the ASA was the effective contract between the parties, Heidi's breach of contract claim does not survive Jetcraft's motion to dismiss.

Under New York law, "[i]t is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself. Consequently, 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009) (quoting *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002)). Courts will enforce only the contractual terms bargained for and assented to by the parties and "may not by construction add or excise terms, nor distort the meaning of those used and thereby 'make a new contract for the parties under the guise of interpreting the writing.'" *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 961 (N.Y. 2001) (quoting *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 157 (N.Y. App. Div. 1983)). Contract interpretation is "generally [a] matter[] of law and therefore [is] suitable for disposition on a motion to dismiss." *PB Ams. Inc. v. Cont'l Cas. Co.*, 690 F. Supp. 2d 242, 247 (S.D.N.Y. 2010) (quoting *Citadel Equity Fund, Ltd. v. Aquila*, Inc., 371 F. Supp. 2d 510, 516 (S.D.N.Y. 2005)); *see also Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) ("Under New York law the initial interpretation of a contract is a matter of law for the court to decide[.]" (internal quotation marks and citation omitted)). When a contract's language is "clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010).

Heidi alleges that the ASA obligated Jetcraft to "provide services . . . that included advising and assisting Heidi in attempting to procure insurance for the Dornier." Compl. ¶ 70; *see also id.* ¶ 71 ("Pursuant to its contractual relationship with Heidi . . . Jetcraft undertook . . . an ongoing duty to advise and assist Heidi in procuring insurance coverage for the Dornier."). It is undisputed that the ASA does *not* contain any clause explicitly requiring Jetcraft to "advise and assist" Heidi

in procuring insurance.  Def.'s Mot. at 22–23; Pl.'s Opp'n at 27.  Indeed, only one reference to "insurance" can be found in the ASA: a disclaimer of any obligation by either party to provide insurance benefits to the other party's "employees, agents or contractors."  *See* ASA § 1.4.  The Court has not identified any other term contained in the four corners of the ASA expressly requiring Jetcraft to aid Heidi in procuring or maintaining insurance for any aircraft which Heidi might purchase.

Instead, Heidi relies on section 1.1 of the ASA as the source of Jetcraft's alleged contractual obligation to "advise" and "assist" Heidi with procuring insurance, which provides:

> [Jetcraft's] services *shall include, but are not limited to*, negotiations with third-parties on behalf and with the direction of [Heidi], coordinating and supervising demonstration flights, conducting or facilitating pre-purchase due diligence, and assisting [Heidi] in completing and filing documentation necessary [to] implement a lease or purchase of a identified aircraft.

ASA § 1.1 (emphasis added); *see* Pl.'s Opp'n at 26.  Heidi argues that this clause defined the "services" Jetcraft agreed to perform to be "broad" and "open-ended," and to include "advising and assisting" Heidi with insurance matters.[7]  Pl.'s Opp'n at 26, 27.  But adopting Heidi's interpretation requires the Court to read this clause in isolation, which it cannot do; a contract must be read as a whole to determine the purpose and intent of its provisions.  *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990); *see also Gary Friedrich Enter., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d Cir. 2013) (explaining that, in interpreting a contract under

---

[7] Heidi cites, for example, deposition testimony of a Jetcraft executive for the proposition that ███████████ ████████  Pl.'s Opp'n at 27.  Whether or not this is accurate, Plaintiff has not alleged this fact in its Complaint, nor has it provided any legal support or other reason that the Court can take judicial notice of this fact on the present motion to dismiss.  And in any event, ████████████████████████ ███████ says nothing of whether Jetcraft was contractually obligated under the ASA to undertake the duties alleged here.

New York law, the court must "not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by the contract as a whole").

The ASA contemplates that Jetcraft's role was to find a suitable aircraft for Heidi's needs, to do what was necessary to ensure the aircraft was properly functioning, and to assist Heidi in purchasing an aircraft.  This role is evidenced by the sentence immediately preceding the clause upon which Heidi relies—which reads: "[Jetcraft] will use its best efforts to evaluate the marketplace, assess aircraft selected or identified by [Jetcraft] or [Heidi], and provide [Heidi] with verbal and/or written evaluations and recommendations for such aircraft."  ASA.  § 1.1.  This phrase cabins the nature of the "services" Jetcraft agreed to perform to those related to Heidi's selection and acquisition of an aircraft.  It would be error for this Court to "supply a specific obligation that the parties themselves did not spell out."  *Sackin v. TransPerfect Global, Inc.*, 278 F. Supp. 3d 739, 750 (S.D.N.Y. 2017).  Absent any contractual term requiring Jetcraft to "advise" or "assist" Heidi in *procuring insurance* for the Dornier, the Court shall decline to impose new obligations under the guise of interpreting the parties' contract.  *See Reiss*, 764 N.E.2d at 961.

Because the ASA does not obligate Jetcraft to "advise" and/or "assist" Heidi in obtaining or maintaining insurance for the Dornier, Heidi's breach of contract claim fails to state a plausible claim for relief and shall be dismissed.[8]

## B.  Negligence (Count 3) and Negligent Misrepresentation (Count 5)

Jetcraft next seeks dismissal of Heidi's claims for negligence (Count 3) and negligent misrepresentation (Count 5).  According to the Complaint, Heidi "requested that Jetcraft procure insurance for the Dornier that would provide coverage for any possible claims or losses related to its operations abroad, including in Africa."  Compl. ¶ 81.  Heidi alleges that Jetcraft "accepted"

---

[8] Heidi makes no allegation that the APA imposed any duty upon Jetcraft to help Heidi procure insurance for the Dornier.  Nor could it, as the APA ███████████████.

this request and "agreed to and did in fact work with Wings for the purpose of procuring insurance coverage for the Dornier." *Id.* ¶ 82; *see also id.* ¶ 98 ("In undertaking to facilitate Heidi's acquisition of the Dornier, Jetcraft further agreed to undertake efforts to procure insurance on Heidi's behalf . . . including coordinating with Wings to provide information to prospective insurers during the underwriting process."). Heidi claims that by agreeing to assist Heidi in obtaining insurance for the Dornier and coordinating with Wings to do so, Jetcraft owed Heidi a duty to "act in good faith and exercise reasonable skill, care, and diligence," and that Jetcraft breached that duty by furnishing incorrect information about the Dornier's "Base Airport" and "Use" in drafting the RFQ and Initial Application. *See id.* ¶¶ 83, 85, 99, 100, 101.

Where, as here, diversity of citizenship is the jurisdictional basis for a case being brought in federal court, "the substantive tort law of the District of Columbia controls." *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006) (internal quotation marks and citation omitted); *see also A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995) ("A federal court sitting in diversity jurisdiction must apply state law to the substantive issues before it." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938))). The parties here agree that District of Columbia law applies to Heidi's tort claims.[9] *See* Def.'s Mot. at 25 n.6; Pl.'s Opp'n at 30.

Under District of Columbia law, it is "well-established that a claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011). A plaintiff alleging negligent misrepresentation

---

[9] While Jetcraft agrees that District of Columbia law applies in the instant motion to dismiss, it "does not concede that D.C. law applies on the merits." Def.'s Mot. at 25 n.6. It is unclear to the Court what law Jetcraft believes should apply on the merits as Jetcraft offers no argument or citation as to its preferred choice of law.

"must show (1) that the defendant made a false statement or omitted a fact that he had a duty to disclose; (2) that it involved a material issue; and (3) that the plaintiff reasonably relied upon the false statement or omission to his detriment." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015) (brackets and internal quotation marks omitted). Jetcraft argues that both claims fail because Heidi has insufficiently pled that Jetcraft owed Heidi a duty of care beyond their contractual relationship, that the economic loss doctrine bars Heidi's recovery in tort, and that Heidi's allegations fail to demonstrate that Jetcraft's conduct caused Heidi's loss. Given the overlap of the Heidi's negligence and negligent misrepresentation claims, the Court will consider them together. The Court shall then separately address Jetcraft's argument that Heidi's negligent misrepresentation claim is insufficient under Rule 9(b).

### 1. Duty of Care

Jetcraft argues that the Complaint fails to allege that Jetcraft owed Heidi a "duty of care" independent from any contractual obligation, which alone would be insufficient to support a claim for liability in tort. Def.'s Mot. at 26–27; *see, e.g.*, *Himmelstein v. Comcast of the Dist., LLC*, 908 F. Supp. 2d 49, 55 (D.D.C. 2012) ("A negligence claim based solely on a breach of the duty to fulfill one's obligations under a contract . . . is duplicative and unsustainable."); *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008). District of Columbia law precludes *tort* liability for the failure to comply with a *contract*. *See Choharis*, 961 A.2d at 1089 ("[T]he tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship.").

But the Complaint does not appear to limit its claims of a tort duty of care owed by Jetcraft to its contractual obligations under the ASA. Instead, Heidi alleges that it "requested that Jetcraft procure insurance for the Dornier" as it had "in prior engagements for Heidi," and that Jetcraft

"agreed to undertake efforts to procure insurance on Heidi's behalf . . . including coordinating with Wings to provide information to prospective insurers." Compl. ¶¶ 81, 98. Construing these allegations most favorably to Heidi, as the Court must do on the present motion, it does not appear that Heidi contends that the alleged "duty of care" owed by Jetcraft was based exclusively on the contractual relationship between the parties, but was rather based on Jetcraft agreeing to undertake extra-contractual tasks related to obtaining insurance coverage for the Dornier in an effort to finalize the sale of the Dornier to Heidi. *See, e.g.*, *id.* ¶¶ 16, 22, 81, 82, 98.

"[A] defendant is liable to a plaintiff for negligence only when the defendant owes the plaintiff some duty of care." *Youssef v. 3636 Corp.*, 777 A.2d 787, 792 (D.C. 2001) (citing *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997)). "Whether there is a duty of care is a question of law." *Presley v. Com. Moving & Rigging, Inc.*, 25 A.3d 873, 883 (D.C. 2011). A plaintiff "must specify a negligent act and 'characterize the duty whose breach might have resulted in negligence liability.'" *Smith v. United States*, 157 F. Supp. 3d 32, 40 (D.D.C. 2016) (quoting *District of Columbia v. White*, 442 A.2d 159, 162 (D.C. 1982)).

Heidi argues that the Complaint sufficiently alleges that Jetcraft owed Heidi a duty to act carefully in its efforts to assist with obtaining insurance coverage and to supply information to prospective insurers, upon which the subsequent insurance policies relied. Pl.'s Opp'n at 29–32 (citing Compl. ¶¶ 5, 16, 27, 81–86, 98). Heidi first cites decisions of the District of Columbia Court of Appeals ("D.C. Court of Appeals") articulating the general principle that "[o]ne who assumes to act . . . may thereby become subject to the duty of acting carefully." *Id.* at 30 (citing *Sec. Nat'l Bank v. Lish*, 311 A.2d 833, 834 (D.C. 1973) (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 239 (1922))). Heidi also relies on section 552 of the Restatement (Second) of Torts, which has been adopted by the District of Columbia and provides, in pertinent part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information[.]

Restatement (Second) of Torts § 552(*1*) (Am. L. Inst. 1977); *see also Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 990–91 (D.C. 1980).  Applying § 552, a court in this jurisdiction concluded that under District of Columbia law, "commercial suppliers of information" owe a duty of care to "those who are intended to receive the information." *Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F. Supp. 2d 45, 49 (D.D.C. 2004).  The complaint in *Okie Dokie* alleged that the defendant-insurance broker misrepresented information in an insurance application, and the plaintiff-insurance company issued an insurance policy based on the false information provided by the broker. *Id.* at 46.  The insurance company sued the insurance broker for damages based on a theory of negligent misrepresentation. *Id.* at 47.  The defendant-insurance broker in that case argued that dismissal under Rule 12(b)(6) was warranted because the plaintiff-insurance company failed to adequately plead a duty of care, arguing that there was generally no duty of care owed by parties to an arm's-length commercial transaction. *Id.* at 48.  The court rejected the defendant's argument—concluding that under general principles of D.C. law, including section 552 of the Restatement, there is "a duty of care owed by commercial suppliers of information . . . to those who are intended to receive the information, even if the recipient is a third party." *Id.* at 49.

Jetcraft responds that *Okie Dokie* is inapposite as it, first, "did not address a situation in which (as here) the parties were arm['s]-length counterparties," and, second, "unlike the insurance broker in [*Okie-Dokie*], Jetcraft is not a 'commercial supplier[]' of insurance information[.]" Def.'s Reply at 15–16.  But contrary to Jetcraft's contention, the court in *Okie-Dokie did* address

a situation in which the parties were "arm['s]-length counterparties"; the defendant in that case argued that no tort duty of care exists between parties in an arm's-length transaction. *Okie-Dokie*, 329 F. Supp. 2d at 48 ("The defendant alleges that there is generally no duty of care owed by parties to an arm's-length commercial transaction."). Moreover, the parties in *Okie-Dokie* were not in contractual privity with one another. *Id.* at 49. The nature of the relationship between Heidi and Jetcraft is therefore arguably closer than that of the parties in *Okie-Dokie*.

Second, that Jetcraft may not be a "commercial supplier" of insurance information is beside the point as neither the holding in *Okie-Dokie* nor the express language of section 552 requires any such finding. There is no requirement in that case that supplying information be a regular or frequent occurrence or central to the business, as Jetcraft seems to be arguing. Here, Heidi has alleged that Jetcraft provided assistance and information regarding insurance both in Heidi's prior aircraft acquisitions and in its purchase of the Dornier from Jetcraft. *See, e.g.*, Compl. ¶¶ 11–13, 24. For purposes of the present motion, these factual allegations are sufficient.

Further, Jetcraft's argument that Heidi failed to allege that Jetcraft had a pecuniary interest in Heidi's procurement of insurance and that "the fact that 'Jetcraft stood to gain financially' is simply irrelevant to the analysis" appears to be incorrect. *See* Def.'s Reply at 17–18. Section 552 "applies only when the defendant has a pecuniary interest in the transaction in which the information is given." *See* Restatement (Second) of Torts § 552 cmt. c. "The fact that the information is given in the course of the defendant's business, profession or employment is a sufficient indication that he has a pecuniary interest in it, even though he receives no consideration for it at the time." *Id.* § 552 cmt. d. Heidi has alleged that Jetcraft supplied certain information regarding the Dornier, that Jetcraft provided such information "in the course of . . . business," and that Jetcraft stood to benefit financially from the procurement of insurance. *See, e.g.*, Compl.

¶¶ 16, 22–26.   Specifically, Heidi has alleged that because it would not have finalized its transaction with Jetcraft to purchase the Dornier without first acquiring insurance, Jetcraft thus "had a pecuniary incentive to place coverage for the Dornier so that Heidi would finalize the deal." *See id.* ¶ 16.   Because Heidi has alleged that Jetcraft assisted Heidi with insurance-related matters in the past and that Jetcraft stood to benefit financially from Heidi's acquisition of insurance, Jetcraft's provision of insurance-related information cannot be said to be purely "gratuitous" and thus beyond the reach of section 552.   *See* Restatement (Second) of Torts § 552 cmt. c. ("If he has no pecuniary interest and the information is given purely gratuitously, he is under no duty to exercise reasonable care and competence in giving it.").

Heidi has alleged sufficient facts to show that Jetcraft owed it a duty of care and that the duty of care it alleges "exist[s] separate and apart from Jetcraft's obligations under the ASA."   Pl.'s Opp'n at 31.   For example, the parties' historical relationship and Jetcraft's consent to undertake tasks related to procuring insurance, including coordinating with Wings and supplying information for the RFQ and the application for the Initial Policy, are enough at the pleading stage to plausibly allege that Jetcraft "assume[d] to act" and thereby "bec[a]me subject to the duty of acting carefully."   *Sec. Nat'l Bank*, 311 A.2d at 834.   Similarly, the Complaint contains sufficient facts to plausibly allege that Jetcraft had a duty to exercise reasonable care in supplying information "for the guidance" of Heidi in securing insurance for the Dornier, in light of Jetcraft's pecuniary interest in finalizing a sale to Heidi—which Heidi alleges would not have occurred without having an insurance policy in place.   Compl. ¶ 16.

### 2.  Economic Loss Doctrine

Jetcraft next argues that Heidi's negligence and negligent misrepresentation claims should be dismissed because the economic loss doctrine bars Heidi's recovery in tort.   Def.'s Mot. at

29–30.  Under District of Columbia law, "a plaintiff who suffers only pecuniary injury as a result

of the conduct of another cannot recover those losses in tort."  *Aguilar v. RP MRP Wash. Harbour,*

*LLC*, 98 A.3d 979, 982 (D.C. 2014).  Jetcraft contends that this rule precludes Heidi from

recovering from Jetcraft for the pecuniary losses it sustained when XL did not cover the "total

loss" of the Dornier.  Def.'s Mot. at 29–30.

The economic loss doctrine is based on the rationale that there is no general tort duty to

refrain from conduct that leads to another party's solely pecuniary injury.  *Whitt v. Am. Prop.*

*Constr., P.C.*, 157 A.3d 196, 205 (D.C. 2017).  In other words, this doctrine "bars recovery of

purely economic losses in negligence."  *Aguilar*, 98 A.3d at 986.  But the D.C. Court of Appeals

recognized that there is a limited exception to this rule "where a *special relationship* exists"

between the parties.  *Id.* (emphasis added).  In other words, a plaintiff may only recover in tort for

a pure economic loss by showing that a "special relationship" existed between the plaintiff and the

defendant.

Heidi argues that the allegations in the Complaint sufficiently allege a "special

relationship" with Jetcraft to invoke the exception to the general bar against recovery in tort for

purely economic losses.  Pl.'s Opp'n at 32.  Jetcraft disagrees that the factual allegations in the

Complaint support such a "special relationship," so the economic loss doctrine bars Heidi's

recovery against Jetcraft.  Def.'s Mot. at 29–30.  Although there is limited legal authority in the

District of Columbia addressing the factual circumstances that may give rise to a "special

relationship," review of those cases is necessary to determine whether Heidi's pleading sufficiently

alleges such a relationship with Jetcraft.

In *Aguilar*—the case in which the D.C. Court of Appeals adopted the economic loss

doctrine—the court concluded that there was no "special relationship" between the owners of a

20

retail complex and the employees of the complex's tenants, who lost income when the complex's stores closed after a flood. 98 A.3d at 980–81. The plaintiff-employees sued the owner-defendants for negligence and argued that because the owner-defendants had "sole control" over the property's flood walls, they owed the employees a duty of care to ensure the safety of the retail complex by raising the flood walls when warned of an impending storm. *Id.* at 981. The Court of Appeals disagreed, concluding that the plaintiffs failed to demonstrate a "special relationship" because there was "no obligation on the part of [the owners] to care for [the employees'] economic well-being. *Id.* at 985.

In reaching this conclusion, the court in *Aguilar* noted that its articulation of the District of Columbia's "special relationship exception conforms with similar exceptions to the economic loss doctrine adopted in other jurisdictions." *Id.* at 985 n.3. Among the cases cited by the D.C. Court of Appeals in *Aguilar* is *L & P Converters, Inc. v. Alling & Cory Co.*, 642 A.2d 264, 267 (Md. Ct. Spec. App. 1994), which holds that a "special relationship" can be demonstrated by a showing of contractual privity between the parties. *Id.* ("Where failure to exercise due care only creates a risk of economic loss, an intimate nexus between the parties is generally required. . . . The requirement of an intimate nexus is satisfied by contractual privity or its equivalent." (citing *Jacques v. First Nat'l Bank*, 515 A.2d 756, 759–60 (Md. 1986))). Although that case is not binding on this Court, "[w]e look to Maryland's common law as Maryland is 'the source of the District's common law and an especially persuasive authority when the District's common law is silent.'" *Xereas v. Heiss*, 987 F.3d 1124 (D.C. Cir. 2021) (quoting *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983)).

Relying on *Aguilar*'s footnote, courts in this jurisdiction have considered whether the parties are in contractual privity in assessing whether a "special relationship" has been adequately alleged. *See, e.g., Vantage Commodities Fin. Servs. I, LLC v. Willis Ltd.*, No. 1:17-CV-01451,

2021 WL 1226767, at *16–17 (D.D.C. Mar. 31, 2021) (finding no "special relationship" where "[t]here was no 'contractual privity or its equivalent'" between the parties); *McDowell v. CGI Fed. Inc.*, No. CV 15-1157, 2017 WL 2392423, at *4–5 (D.D.C. June 1, 2017) (holding that plaintiff did not adequately allege a "special relationship" existed with defendant because, *inter alia*, plaintiff did "not argue that she was in contractual privity, or its equivalent," with defendant).[10]

In contrast to *Aguilar*, the D.C. Court of Appeals in *Whitt*, applying the economic loss rule articulated in *Aguilar*, concluded that a special relationship did exist between the plaintiff, a hair salon owner, and the defendants, a gas company and contractor undertaking construction activities which disrupted the plaintiff's business. 157 A.3d at 199–200, 204–05. Specifically, the court noted that a permit authorizing the construction activities "recognized the impact that [defendants'] actions would have on [plaintiff's] business when it required that the construction 'not block access'" to the plaintiff's business entrance. *Id.* at 205. The court reasoned that these permit requirements provided evidence that defendants "undertook obligations that would 'implicate [plaintiff's] economic expectancies.'" *Id.* (citing *Aguilar*, 98 A.3d at 985). Considering these permit requirements and the "extensive [construction] activity over a prolonged period," the court concluded that the parties were in a "special relationship," meaning that defendant owed plaintiff a duty of care—the breach of which would subject the defendant to tort liability. *Id.* at 205–06.

Though limited, this precedent considering the "special relationship" exception to the economic loss doctrine requires the Court to consider whether the Complaint alleges sufficient facts to demonstrate that Jetcraft had an obligation to care for Heidi's economic well-being or an

---

[10] Jetcraft's reliance on *McDowell* is, therefore, misplaced, as Heidi *was* in contractual privity with Jetcraft, unlike the parties in *McDowell*. *See* Def.'s Mot. at 30. Further, the plaintiff in *McDowell* argued only that a "special relationship" existed due to the foreseeability of injury to her, an argument the court summarily rejected given *Aguilar's* express command that foreseeability is insufficient to recover pure economic loss in tort. *McDowell*, 2017 WL 2392423, at *5.

obligation that "implicate[d] [plaintiff's] economic expectancies." *Id.* at 205 (citing *Aguilar*, 98 A.3d at 985). Moreover, this precedent suggests that a showing of a "close" or "intimate nexus" between the parties can establish a special relationship. *Aguilar*, 98 A.3d at 985 n.3. As discussed, *supra*, the court in *Aguilar* suggests (without having to decide the issue) that contractual privity between the parties can suffice to show a "close" or "intimate nexus" and, thus, a "special relationship." *Id.* (citing *L & P Converters, Inc.*, 642 A.2d at 267 (holding that an "intimate nexus" can be demonstrated by a showing of contractual privity)).

That Jetcraft and Heidi were in contractual privity with one another is undisputed. *See, e.g.*, Compl. ¶¶ 10, 17; Def.'s Mot. at 4–5. Jetcraft argues that there is "no allegation that the APA contains language creating a 'special relationship' between Heidi and Jetcraft." Def.'s Mot. at 30. But this argument misses the point; the particular terminology and language used in the contract is irrelevant to the question of whether the Complaint sufficiently alleges a "close nexus" between Heidi and Jetcraft to allow Heidi to invoke the "special relationship" exception to the economic loss doctrine.

At this stage, the Court finds that Heidi has adequately alleged facts demonstrating that it was in a "special relationship" with Jetcraft such that the economic loss rule will not bar Heidi from recovering in tort purely pecuniary loss.

### 3. Causation

Jetcraft also argues that Heidi's Complaint fails to allege that Jetcraft's allegedly negligent conduct in providing information for the RFQ and application for the Initial Policy caused Heidi's injuries. Def.'s Mot. at 15–18. Jetcraft notes, for example, that the Complaint does not allege any involvement by Jetcraft in submitting the application for the Renewal Policy, which was the effective policy when the Dornier crashed. *Id.* at 15 ("[F]rom the inception of the renewal process

to the issuance of the Renewal Policy, Heidi alleges the direct involvement of only itself and its insurance broker, Wings."). As Jetcraft puts it, Heidi fails to allege that "Jetcraft was in any way involved in generating" the information contained in the application for the Renewal Policy when it was being prepared in late 2016. *Id*. at 15–16. Jetcraft further contends that *Heidi* failed to exercise reasonable care to ensure that the information provided in the application for the Renewal Policy was correct. *Id.* at 18–19. Although Jetcraft does not explicitly characterize these purported deficiencies with the Complaint as arguments pertaining to causation, the thrust of Jetcraft's argument is that Heidi has not pled sufficient facts to establish that its alleged negligence or negligent misrepresentation caused Heidi's injuries.

As noted above, a plaintiff asserting a negligence claim must plead facts to show that its injury was proximately caused by the defendant's breach of its duty of care. *See Hedgepeth*, 22 A.3d at 793. The D.C. Court of Appeals "has defined proximate causation as that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172, 199–200 (D.D.C. 2007) (quoting *District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005)). "[A]n actor whose conduct is a substantial factor in bringing about [the] harm shall be liable in negligence" for "harm foreseeably attributable to his or her conduct." *Id.* at 200 (quoting *White v. United States*, 780 F.2d 97, 106 (D.C. Cir. 1986) (alterations in original)). Given this fact intensive analysis, "in most cases, the existence of proximate cause is a question of fact for the jury." *Id.* at 185 (quoting *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 644 (D.C. Cir. 1988)). "[O]nly if it is absolutely clear that the [defendant's] negligence could not have been a proximate cause [of the harm asserted by the plaintiff] is it a question of law." *Id.* (quoting *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994)); *accord Sanders v. Wright*, 642 A.2d 847,

849 (D.C. 1994) ("The question becomes one of law . . . when the evidence [that would be] adduced at trial will not support a rational finding of proximate cause."); *Wash. Metro. Area Transit Auth. v. Jones*, 443 A.2d 45, 50 (D.C. 1982) (en banc) ("It is only in a case where the facts are undisputed and, considering every legitimate inference, only one conclusion may be drawn, that the trial court may rule as a matter of law on . . . proximate cause.").

Jetcraft is correct that the Complaint does not allege any specific facts that Jetcraft had any role in completing the application for the Renewal Policy. *See* Def.'s Mot. at 15; *see, e.g.*, Compl. ¶ 40 (alleging that "Wings requested that Heidi complete a two-page Wings Renewal Application for Insurance" and "[t]he Renewal Application was populated by Wings"); *id.* ¶ 41 ("Heidi signed the Renewal Application …."); *id.* ¶ 42 ("Wings submitted Heidi's Renewal Application to XL."); *id.* ¶ 43 ("Wings requested that XL bind coverage for an additional year …."). But the Complaint has alleged sufficient facts to show that the information used therein was supplied—at least, in part—by Jetcraft, that the information was incorrect, and that Jetcraft knew or "should have understood . . . the profound consequences on the coverage available . . . if the disclosures in the [Application and Renewal Application] were inaccurate." *See* Compl. ¶¶ 59, 60, 64, 66. Drawing all inferences in Heidi's favor, as the Court is required to do on the present motion, Heidi has alleged sufficient facts to state a plausible claim that Jetcraft's initial provision of information proximately caused Heidi's later injury, and that it was reasonably foreseeable to Jetcraft that providing incorrect information could result in an insurer denying coverage based on that information.

Jetcraft also argues that because XL based its decision to rescind insurance coverage for the Dornier (1) solely on the misrepresentations in the Renewal Policy and, (2) in part, based on other misrepresentations in the Renewal Policy that Jetcraft played no role in, Heidi's claims must

be dismissed.  *See* Def.'s Mot. at 17–18.  Jetcraft fails to consider Heidi's allegation that Jetcraft's

misrepresentations in the RFQ and Initial Policy were reincorporated into the Renewal Policy and

therefore could have plausibly formed the basis for XL's rescission action.  *See* Compl. ¶¶ 32, 40.

That XL may have based its rescission action in part on other alleged misrepresentations not made

by Jetcraft does not negate the fact that XL sought rescission based on representations Jetcraft

admits it made that were incorporated into the Renewal Application.  "The law does not recognize

a single proximate cause of every injury.  There may be several causes concurring to produce the

harm."  *Hill v. McDonald*, 442 A.2d 133, 137 (D.C. 1982) (citing *Ballard v. Polly*, 387 F. Supp.

895, 900 (D.D.C. 1975)).  That there may have been more than one cause of Heidi's injuries

provides no relief for Jetcraft because "[t]o be the proximate cause is not necessarily to be the sole

cause."  *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 67 (D.C. Cir. 2019)

(citing *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 996 (D.C. Cir. 1977)).

Further, the D.C. Court of Appeals has explained that, "[a]lthough the intervening act of

another makes the causal connection between the defendant's negligence and the plaintiff's injury

more attenuated, such an act does not by itself make the injury unforeseeable."  *Majeska v. District*

*of Columbia*, 812 A.2d 948, 951 (D.C. 2002) (quoting *District of Columbia v. Carlson*, 793 A.2d

1285, 1290 (D.C. 2002).  Defendants who have breached a duty are therefore held "responsible

for the damages which result, despite the intervention of another's act in the chain of causation, if

the danger of an intervening negligent . . . act should have been reasonably anticipated and

protected against."  *Id.* (quoting *Carlson*, 793 A.2d at 1290).  As pled, it is plausibly foreseeable

that Jetcraft's provision of incorrect information could result in XL declining to cover Heidi for

any future loss.

Moreover, at the motion to dismiss stage, where "it is not absolutely clear that the defendant's negligence *could not* have been a proximate cause of the harm asserted by the plaintiff," the Court "must deny [the plaintiff's] motion to dismiss[.]"  *Bradley v. NCAA*, 249 F. Supp. 3d 149, 168 (D.D.C. 2017) (emphasis added) (internal quotations and alterations omitted); *see also Beach TV Props., Inc. v.* Solomon, 324 F. Supp. 3d 115, 127 (D.D.C. 2018) (noting that substantive questions regarding proximate cause are "better addressed later, at the summary judgment stage, or perhaps after, with the benefit of a full record from discovery, including expert opinions").  At this early stage, the Court cannot conclude that proximate cause does not exist, and therefore the Court shall deny Jetcraft's motion as to the negligence and negligent misrepresentation claims.  *See Bradley*, 249 F. Supp. 3d at 168.

### 4.  Federal Rule of Civil Procedure 9(b)

Finally, Jetcraft argues that Heidi has failed to adequately plead a claim of negligent misrepresentation under Federal Rule of Civil Procedure 9(b).[11]  Rule 9(b) imposes certain heightened pleading requirements for claims alleging fraud or negligent misrepresentation.  *See Bradley*, 249 F. Supp. 3d at 170; *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 206 (D.D.C. 2016) (citing *Jefferson v. Collins*, 905 F. Supp. 2d 269, 286 (D.D.C. 2012)).  To satisfy this standard, "the pleader [must] . . . state the time, place and content of the false misrepresentations, the fact

---

[11] Jetcraft makes the same argument regarding Heidi's failure to meet the Rule 9(b) requirements with respect to Heidi's fraudulent misrepresentation claim. *See* Def.'s Mot. at 30–31, 33. Given the identical nature of Jetcraft's arguments, the Court will decide here the sufficiency of the Complaint under Rule 9(b) for both its negligent and fraudulent misrepresentation claims. The Court addresses the remainder of Jetcraft's arguments regarding Heidi's fraudulent misrepresentation claim, *infra* Section III(C).

misrepresented and what was retained or given up as a consequence of the fraud," and "identify individuals allegedly involved in the fraud." *Williams*, 389 F.3d at 1256 (citations omitted).

Jetcraft argues that Heidi's misrepresentation claims fail to satisfy the heightened pleading of Rule 9(b) because Heidi improperly combines the various defendants and "never explains which representations these individuals supposedly made." *See* Def.'s Mot. at 31.  The Court is not persuaded by this argument because Heidi has specifically identified the individual at Jetcraft who made the alleged misrepresentations. *See e.g.*, Compl. ¶¶ 102, 119.  And Heidi also identifies the other participants in the communications in which the alleged misrepresentations were made, which provides additional notice of the circumstances and timing of any alleged misrepresentation. *See* Fed. R. Civ. P 9(b) ("[A] party must state with *particularity the circumstances* constituting fraud . . . .") (emphasis added); *see also* Compl. ¶¶ 102, 119 (alleging that the persons involved in the communications containing misrepresentations were "Heidi principal Melissa Bates; Wings employees Ryan Konrath, Jeff Dalton, and Tom Hauge; and Dan Dunn of Jetcraft").

Furthermore, Heidi identifies the specific misrepresentations allegedly made by Jetcraft. *See, e.g.*, Compl. ¶¶ 101, 118 ("[Jetcraft] [m]isrepresented the Aircraft's 'Base Airport' and 'Use' in written submissions to prospective insurers of Heidi . . . .").  And Heidi identifies a narrow range of dates during which the alleged misrepresentations took place: March 8–12, 2016. *Id.* ¶¶ 102, 119.  Finally, Heidi alleges that the misrepresentations occurred through email and telephone communications. *See id.* ¶¶ 102, 119.  Heidi has alleged sufficient facts to satisfy the Rule 9(b) standard and to adequately put Jetcraft on notice of the particular circumstances surrounding Heidi's fraudulent and negligent misrepresentation claims.

## C.  Fraudulent Misrepresentation (Count 7)

Jetcraft next argues that Heidi's fraudulent misrepresentation claim should be dismissed for failure to meet the pleading requirements of Rule 9(b) and because "the misrepresentations Heidi identifies are either unactionable statements of opinion, pertained only to the Initial Application, or both." Def.'s Mot. at 33 (citations omitted).  For the reasons stated *supra* Section III(B)(4), the Court finds that Heidi has sufficiently pled facts to survive dismissal under Rule 9(b).

To state a claim for fraudulent misrepresentation, a plaintiff must allege: "(1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013).  "A misrepresentation is an assertion that is not in accord with the facts." *Id.* (quoting *Sarete, Inc. v. 1344 U Street Ltd. P'ship*, 871 A.2d 480, 493 (D.C. 2005)).  "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." *Id.* (quoting *Sarete*, 871 A.2d at 493).

Jetcraft relies on two cases from this jurisdiction in support of its argument that statements of "opinion" are unactionable as fraud claims.  *See* Def.'s Mot. at 32 (citing *Capitol Just., LLC v. Wachovia Corp.*, No. CV 07-2095, 2008 WL 11388566, at *5 (D.D.C. June 11, 2008)); Def.'s Reply at 20 (citing *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 794 F. Supp. 434 (D.D.C. 1992)). In *Capitol Justice*, the court found that a defendant's statement that plaintiffs need "not to worry" about a provision in a loan agreement absent a "9/11-type meltdown" was an unactionable opinion statement. 2008 WL 11388566, at *5.  In *Bennett*, the court dismissed a claim of fraud, explaining that an interpretation as to the legal effect of a "distressed store" designation provision in a franchise agreement was an unactionable statement of opinion.  794 F. Supp. at 437.  However,

the court noted that the defendant's representation that the plaintiff's store actually was "distressed" was a factual statement "actionable in tort." *Id.*

Jetcraft argues that Heidi's fraudulent misrepresentation claim rests on two statements of Jetcraft's "opinion": first, that Jetcraft told Heidi that Heidi had "'secured valid insurance' that would 'respond to a covered loss," Def.'s Mot. at 32 (quoting Compl. ¶ 101(c)); and second, that the statements to the insurers in the RFQ and Application for the Initial Policy regarding the "Base Airport" and "Use" of the Dornier were "accurate and appropriate," *id.* (quoting Compl. ¶ 101(b)). But Jetcraft ignores other alleged representations made by Jetcraft beyond these two. For example, Heidi alleges that Jetcraft represented that the "Use" of the Dornier would be for "Industrial Aid" and the "Base Airport" would be "IAD." *See* Compl. ¶¶ 30–31, 101(a). Such representations were factual in nature and cannot plausibly be viewed as opinions. In contrast to the "not to worry" remark in *Capitol Justice*, representing to Heidi that Dulles Airport would be appropriate to list as the Dornier's "Base Airport" and subsequently representing to insurers that the "Base Airport" would, in fact, be Dulles Airport is a factual statement in nature. *Capitol Justice*, 2008 WL 11388566, at *5. Heidi alleges that representing Dulles as the Dornier's "Base Airport" is an "assertion that is not in accord with the facts." *Saucier*, 64 A.3d at 438 (quoting *Sarete*, 871 A.2d at 493); *see, e.g.*, Compl. ¶ 32. Moreover, unlike the representations in *Bennett*, Jetcraft's alleged representations were not simply legal opinions or interpretations of legal language. *Bennett*, 794 F. Supp. at 437. Heidi does not allege that Jetcraft merely advised Heidi as to the legal meaning of the term "Base Airport," for instance, but that Jetcraft affirmatively represented as a matter of fact that IAD would be the correct airport to list for insurance purposes. *See, e.g.*, Compl. ¶ 32 ("Jetcraft . . . concluded . . . [that] it was permissible and accurate to designate IAD-Dulles as the 'Base Airport' in disclosures to Heidi's prospective insurers."). Just like the defendant's

representation in *Bennett* that Plaintiff's store was "distressed and experiencing financial difficulty" was found to be a potentially actionable factual statement, so too is Jetcraft's statement to Heidi regarding the "Use" and "Base Airport" of the Dornier. *Id.*

Jetcraft next argues that the fraudulent misrepresentation claim fails as it "pertained only to the Initial Application." Def.'s Mot. at 32. Jetcraft is correct that Heidi does not allege that Jetcraft made any new misrepresentations in connection with the Renewal Application. Rather, Heidi alleges that Wings reincorporated the misrepresentations Jetcraft had supplied for the RFQ and Initial Policy into the Renewal Policy. *See* Compl. ¶ 40 ("The Renewal Application was populated by Wings and adopted and incorporated the same representations regarding the Aircraft's 'Use' and 'Base Airport' that Jetcraft and Wings had included in the RFQ and the first Application (without revision from Heidi)."). Taking all allegations as true and construing all reasonable inferences in Heidi's favor, the Court finds that Heidi has adequately alleged that Jetcraft's factual misrepresentations formed part of the Renewal Policy and that Heidi relied upon those representations to its detriment. Jetcraft does not dispute that the information it provided to Wings and Heidi regarding the "Use" and "Base Airport" of the Dornier was incorrect nor that those representations were included in the Renewal Application and relied upon by Heidi. At this stage, Heidi has alleged sufficient facts to survive dismissal of its fraud claim.

## D.  Breach of Fiduciary Duty (Count 9)

Jetcraft next seeks dismissal of Heidi's breach of fiduciary duty claim (Count 9). Heidi alleges that Jetcraft had a "special relationship of trust and confidence" with Heidi, due to the parties' "long-standing business relationship." Compl. ¶ 134. Heidi further claims that it "trusted and relied upon Jetcraft to provide sound advice," including with respect to Heidi's applications for insurance, and that Jetcraft knew about Heidi's reliance. *Id.* ¶¶ 135–36. Heidi contends that Jetcraft breached its fiduciary duty to "exercise good faith and reasonable diligence" when

"procuring Heidi's aviation insurance for the Dornier" by furnishing incorrect information about the "Base Airport" and "Use" of the Dornier to be included in the RFQ that was distributed to prospective insurers and incorporated in Heidi's insurance policy application. *Id.* ¶¶ 30–32, 40, 137–38.  Jetcraft argues that this claim fails under Rule 12(b)(6) because the parties' relationship at the time of the alleged breach was governed by a contract, which did not give rise to a fiduciary relationship, and that Heidi failed to allege sufficient facts to show that the parties "prior dealings" created  a fiduciary relationship.  Def.'s Mot. at 35.

To state a claim for breach of fiduciary duty a plaintiff must allege facts sufficient to show (1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the fiduciary relationship; and (3) injuries that were proximately caused by the breach of fiduciary duties." *Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185, 190–91 (D.D.C. 2009).  "[A] fiduciary relationship is founded upon trust or confidence reposed by one person in the integrity and fidelity of another."  *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015) (quoting *Gov't of Rwanda v. Rwanda Working Grp.*, 227 F. Supp. 2d 45, 64 (D.D.C. 2002)).  District of Columbia courts have "deliberately left the definition of a 'fiduciary relationship' open-ended, allowing the concept to fit a wide array of factual circumstances."  *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 341 (D.D.C. 2011); *see also Millennium Square Residential Ass'n v. 2200 M St. LLC*, 952 F. Supp. 2d 234, 248 (D.D.C. 2013) ("District of Columbia law has deliberately left the definition of 'fiduciary relationship' flexible, so that the relationship may change to fit new circumstances in which a special relationship of trust may properly be implied.").

To decide whether a fiduciary relationship exists, a court must conduct "'a searching inquiry into the nature of the relationship, the promises made, the types of services given and the

legitimate expectations of the parties.'" *Council on Am.-Islamic Rels.*, 793 F. Supp. 2d at 341 (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996)). "Whether a fiduciary relationship exists is a fact-intensive question," *Millennium Square*, 952 F. Supp. 2d at 248, so "a claim for breach of fiduciary duty is generally not amenable to dismissal for failure to state a claim when the claimed ground for dismissal is absence of a fiduciary relationship." *Council on Am.-Islamic Rels.*, 793 F. Supp. 2d at 341.

Jetcraft argues that the Complaint fails to allege sufficient facts demonstrating that it had any fiduciary relationship with Heidi. Def.'s Mot. at 34. Jetcraft contends that, at most, Heidi's allegations indicate that the two parties had a contractual relationship, which is insufficient to give rise to a fiduciary duty. *Id.* at 34, 39. To be sure, "[a]s a general rule, the mere existence of a contract does not create a fiduciary duty." *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 6 (D.D.C. 2008); *see also Xereas v. Heiss*, 987 F.3d 1124, 1132–33 (D.C. Cir. 2021). But courts in this jurisdiction have also noted that a fiduciary relationship "may exist where circumstances show that the parties extended their relationship beyond the limits of the contractual obligations to a relationship founded upon trust and confidence." *Command Consulting Grp., LLC v. Neuraliq*, 623 F. Supp. 2d 49, 54 (D.D.C. 2009) (quoting *Paul,* 543 F. Supp. 2d at 6) (internal quotation marks omitted).

Upon careful review of the allegations in the Complaint, the Court finds that Heidi has alleged sufficient facts to state a plausible claim that the "nature of the relationship, the promises made, the types of services given and the legitimate expectations of the parties" could give rise to a fiduciary relationship. *Council on Am.-Islamic Rels.*, 793 F. Supp. 2d at 341 (quoting *Firestone*, 76 F.3d at 1211). For example, Heidi has alleged that Jetcraft has aided Heidi with aviation insurance in the past and that Heidi thereby relied upon Jetcraft's purported knowledge and

experience in assisting Heidi with procurement of insurance for the Dornier. *See, e.g.*, Compl. ¶¶ 11–13, 24–26. Construing these facts and all reasonable inferences drawn therefrom—as the Court must do at this stage—Heidi's allegations state a plausible claim that the two parties had a fiduciary relationship.

Jetcraft next argues that both the APA and ASA circumscribed its relationship with Heidi, and that these contracts preclude Heidi's claims that the two had any special relationship. Jetcraft argues that the APA—which was executed *before* Jetcraft allegedly supplied information to be circulated to prospective insurers—involved an arm's-length sale of the Dornier between two sophisticated parties. Def.'s Mot. at 35. Alternatively, under the ASA, Jetcraft's role was that of an "independent contractor," not as an agent of Heidi. Jetcraft contends that these contracts dictated the scope of the parties' relationship, and Heidi has failed to allege sufficient facts showing that their relationship "extended beyond the limits of the[ir] contractual obligations to a relationship founded upon trust and confidence." *Command Consulting Grp., LLC*, 623 F. Supp. 2d at 54 (quoting *Paul*, 543 F. Supp. 2d at 6). To be sure, that Heidi and Jetcraft had previously worked together does not necessarily transform an ordinary business relationship into a fiduciary relationship. However, considering the "nature of the relationship, the promises made, the types of services given and the legitimate expectations of the parties," the Court finds that Heidi has adequately alleged the existence of a fiduciary duty under District of Columbia law to survive Jetcraft's motion to dismiss. *Council on Am.-Islamic Rels.*, 793 F. Supp. 2d at 341 (quoting *Firestone*, 76 F.3d at 1211). Heidi has alleged that it relied upon and trusted Jetcraft in aviation-related matters and that it relied upon the representations made by Jetcraft in helping Heidi acquire insurance for the Dornier. Moreover, the Complaint's allegations indicate that Heidi's relationship with Jetcraft was greater and more intimate than Jetcraft suggests; Heidi has alleged that Jetcraft

advised Heidi on numerous prior occasions.  *See, e.g.*, Compl. ¶¶ 11–13 ("The scope and nature

of Heidi's and Bancroft's operations were well-known and understood by both Jetcraft and Wings

as a result of their prior work with Heidi in procuring insurance for aircraft flown in Africa and

other areas of operation for Heidi/Bancroft.").

Even if Jetcraft is correct that the APA was the sole contract in effect at the time of the

alleged misrepresentations and that the APA reduced Jetcraft's relationship with Heidi to that of

an arm's-length counterparty, that Jetcraft chose to advise and assist Heidi on a matter outside the

scope of that contract (*i.e.*, █████████████) may have altered the "nature of the relationship,

the promises made, the types of services given and the legitimate expectation of the parties."

*Council on Am.-Islamic Rels.*, 793 F. Supp. 2d at 341 (quoting *Firestone*, 76 F.3d at 1211).

The Court finds that Heidi has adequately alleged facts to survive a motion to dismiss its

breach of fiduciary duty claim.  Taking all well-pled allegations as true and construing all

inferences in favor of Heidi, the Court determines that Heidi's allegations regarding the nature of

the relationship it had with Jetcraft, the promises and assistance to Heidi provided by Jetcraft, and

Heidi's reliance thereon are sufficient to satisfy the pleading requirements of Rule 12(b)(6).

**E.  Limitation on Liability**

Finally, Jetcraft argues that Heidi's claims must be dismissed because, pursuant to the

ASA, both parties agreed to forego certain damages against the other.  *See* Def.'s Mot. at 41–42.

Specifically, the ASA states:

> To the maximum extent permitted by applicable law, neither
> [Jetcraft] nor [Heidi] will be liable to the other or any third party for
> any special, indirect, consequential or punitive damages or costs,
> including lost profits arising out of or related to this Agreement and
> the Services and/or Aircraft supplied hereunder, even if the Parties
> have knowledge of the possibility of such damages or costs and
> whether or not such damages or costs are foreseeable.

ASA § 4.8.  Although Jetcraft also argues that the ASA was not in effect at the time of its alleged wrongdoing, *see supra* note 6, it contends that this provision forecloses Heidi from recovering for the claims brought in this lawsuit.  *See* Def.'s Mot. at 41–42.

Assuming that the ASA was in effect at the time of Jetcraft's alleged wrongdoing, the liability limitation does not fully bar Heidi's claims here. For one, the clause does not unambiguously and expressly attempt to limit ordinary tort damages for tort claims. The clause excludes only "special, indirect, consequential [and] punitive damages," damages which arise in the context of breach of contract claims. *See, e.g.*, Restatement (Second) of Contracts § 351 (defining "consequential" or "special" damages); *id.* § 355 (defining "punitive" damages); N.Y. U.C.C. § 2-715; *Berwind Corp. v. Litton Indus., Inc.*, 532 F.2d 1, 7 (7th Cir. 1976) ("[T]he use of the words 'consequential damages' refers to contract rather than tort damages."). "Consequential" and "indirect" damages are synonymous terms that "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach [of contract]." *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000)) (emphasis added); *see also* Damage*s*, *Black's Law Dictionary* (11th ed. 2019).

Terms like "consequential" and "punitive" damages may also be found in the realm of tort, particularly "punitive" damages; however, the limitation of such damages in the ASA still does not bar Heidi's claims.  Even if the limitation on "consequential" and "punitive" damages attempts to bar certain types of tort damages, such a limitation is unenforceable insofar as it attempts to bar damages for fraud. *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416–17 (N.Y. 1983) (stating that an exculpatory clause "will not apply to exemption of willful or grossly negligent acts"); *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370 (N.Y. 1992) ("It is the public policy of this State . . . that a party may not insulate itself from damages caused by grossly negligent

conduct."). For example, New York courts refuse to enforce exculpatory clauses for claims of both fraudulent misrepresentation and negligent misrepresentation where a party acted with gross negligence or willful misconduct. *See id.; Sear-Brown Grp. v. Jay Builders, Inc.*, 665 N.Y.S.2d 162, 163–64 (App. Div. 1997); *Turkish v. Kasenetz*, 27 F.3d 23, 27–28 (2d Cir. 1994). Heidi has pled that Jetcraft acted willfully, wantonly, and grossly negligently. *See* Compl. ¶ 67. At this stage, taking all inferences in Heidi's favor, the Court finds that the limitation of liability clause in the ASA, if in effect at all, does not warrant a dismissal of the remaining claims. At most, the limitation of liability clause may bar Heidi from certain contractual damages for its breach of contract claim. However, the Court need not decide that issue as the Court finds that Heidi's breach of contract claim should be dismissed under Rule 12(b)(6).

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Jetcraft's Motion to Dismiss as to Heidi's breach of contract claim (Count 1) and **DENIES** Jetcraft's Motion as to all remaining claims. An appropriate Order accompanies this Memorandum Opinion.

_____/S/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

Date: November 15, 2021